### ROWAN & NICHOLS OIL CO. v. RAILROAD COMMISSION OF TEXAS et al.

### No. 624.

District Court, W. D. Texas, Austin Division.

June 12, 1939.

Judgment affirmed Nov. 3, 1939.

Dan Moody, of Austin, Tex., and Tilley & Tocker, of Fort Worth, Tex., for complainant.

Gerald C. Mann, Atty. Gen. of Texas, James P. Hart and D. D. Mahon, Assts. Atty. Gen. of Texas, and Harry S. Pollard, of Austin, Tex., for respondents.

McMILLAN, District Judge.

This case as originally filed was one for three judges. Complainant, however, abandoned its application for interlocutory relief and the case was, by the agreement of all parties, submitted to one judge for final determination on its merits.

Complainant sues for an injunction to restrain the enforcement by the Commission of the order of August 29, 1938, in so far as it affects the production of oil from its mineral lease in the East Texas field. By stipulation of the parties, it was agreed that it would be unnecessary to amend to cover the orders subsequently entered continuing the same plan of proration.

More than the jurisdictional amount is shown to be involved and the order and its method of enforcement and application are attacked as confiscatory. The jurisdiction of the court appears of record and is in no way challenged by any of the parties.

Article 6029 of the Revised Civil Statutes of Texas, Vernon's Ann.Civ.St.Tex. art. 6029, directs the Commission generally to make and enforce orders for the conservation of crude petroleum oil to prevent the waste thereof.

Article 6049c, Vernon's Ann.Civ.St. Tex., in so far as it is pertinent here, provides: "In the event any such rule, regulation or order which the Commission may adopt provides for the limitation or fixing of the production of crude petroleum oil,

or of natural gas from wells producing gas only, in any pool or portion thereof, the Commission shall distribute, prorate, or otherwise apportion or allocate, the allowable production among the various producers on a reasonable basis."

The order of August 29, 1938, in so far as it applied to the East Texas field, after fixing a top allowable of not to exceed 450,000 barrels a day as desirable, proceeded as follows:

"Rule 23 (a). Therefore, it is further ordered by the Railroad Commission of Texas that during each twenty-four (24) hour period beginning at 7 o'clock a.m., Central Standard Time, September 1, 1938, the owner or operator or manager of each well in the East Texas field shall be permitted either collectively or individually, to produce from each well a maximum of two and thirty two hundredths (2.32%) Per cent of its hourly potential capacity as determined by the Commission."

By subsequent orders, shutdowns for two days a week have been put in effect. Furthermore, the evidence shows without contradiction, and in fact the parties have stipulated, that the method of application and enforcement of this order by the Commission is very different from the actual wording of the order itself. According to the stipulation which the parties have filed in the case, the Commission's interpretation, application and enforcement of this order is substantially as follows: A top allowable for the days during which the wells were allowed to produce of 522,500 barrels was fixed. Each well in the field that could not produce as much as 20 barrels per day was allowed to make all it could produce. Where the figure of 2.32% of the hourly potential of any well amounted to less than 20 barrels a day, that figure was disregarded and the well was allowed to produce 20 barrels a day. Where the figure of 2.32% would amount to more than 20 barrels per day, the well was allowed to produce on that basis. This application of the order resulted in the following: Approximately 451 wells, not any one of which was capable of producing as much as 20 barrels per day, were allowed to produce daily a total of approximately 5,250 barrels. Approximately 19,032 wells whose individual hourly potential when multiplied by 2.32% amounted to less than 20 barrels, were each allowed to produce a full 20 barrels per day; or from all of such wells a total of approximately 380,640 barrels per day. These were wells whose hourly potential ranged anywhere from 1 barrel to 860 barrels per hour. Approximately 6,325 wells whose individual potential when multiplied by 2.32% amounted to more than 20 barrels were each allowed to produce daily that number of barrels which equaled the product of its hourly potential multiplied by 2.32%. The total daily production from these wells was approximately 136,610 barrels. These wells had an hourly potential ranging from 865 barrels per hour to about 1,100 barrels per hour. In practical operation, the daily allowable of no well was controlled by the factor 2.32% of its hourly potential unless such well had a potential of 865 barrels or more per hour.

■ It is manifest that the way in which the Commission interprets, applies and enforces this order is entirely different from the order. Accordingly, the question of the validity of the actual order itself is not controlling, for as said by the Supreme Court in Greene v. Louisville & Interurban R. R. Co., 244 U.S. 499, 507, 37 S.Ct. 673, 677, 61 L.Ed. 1280, Ann.Cas.1917E, 88: "A valid law may be wrongfully administered by officers of the state, and so as to make such administration an illegal burden and exaction upon the individual." See, also, Southern Realty Corporation v. McCallum, D. C., 1 F.Supp. 614, at page 619.

Therefore the matter to be considered here is not the validity of the order as written but as construed and enforced by the Commission.

Complainant, in its brief, makes it clear that it does not attempt to attack the validity of the conservation statutes; that it does not now directly attack the top allowable fixed for the field; and further that it does not attack the spacing rule, generally called Rule 37. The gravamen of its complaint lies in its assertion, forcibly presented, that the Commission does not allocate the allowed production among the various producers "on a reasonable basis". In other words, it says that granting the right of the State to conserve its natural resources, conceding for the present the validity of the Commission's order in fixing the top allowable of the field, the manner in which this allowable has been allocated to the various parties is discriminatory and constitutes a confiscation of complainant's property.

Respondents, on their part, set up generally the characteristics of the East Texas field, the necessity for regulation, prora-

tion and so forth. They then assert that owing to the number of wells in the field and the conditions there existing, the present order is practically the only one that can be feasibly worked out. Large amounts of evidence were introduced with regard to the East Texas field generally, covering its characteristics, formations, geology and production problems. Those are matters which have all been gone over and discussed in numerous other cases involving that field and it is not necessary to again set them out here. A brief statement of some of the pertinent facts developed upon the trial, coupled with the statements which have been heretofore made, will be sufficient to dispose of this case.

Complainant has a lease of something over twenty-four acres and on this lease it has five wells. All of the wells are producers and, according to the Commission's potentials, they are capable of producing in excess of 865 barrels per hour. Under the order as applied, these wells are allowed to produce a fraction over 22 barrels a day for five days a week. The field is approximately 40 miles long and has an average width of about 4 miles. There are about 26,000 oil wells in the field. Of these, all save approximately 25 are producers. There are some wells which are capable of producing only 6 or 7 barrels a day and some wells that will produce over 25,000 barrels a day. Between those figures there is a wide spread in potentials. Complainant's wells, according to the Commission's figures, will produce on open flow over 20,000 barrels a day. But the actual result of production on open flow, of course, is not known and any such production would in all probability immediately result in a lessening of potentials. However, the figures as computed indicate the relative capacity of the various wells, according to the Commission's notion. Complainant attacks the method of obtaining these potentials but it is unnecessary to pass on that matter to decide this case. It can and should be determined on broader issues. The wells are located upon tracts of various sizes. Constant exceptions to the spacing rules have resulted in great density in drilling. In many instances, there are wells on a fraction of an acre. In complainant's case, there is an average of 1 well to about 5 acres. The structure and formation of the field varies. Toward the West, water is encroaching. Toward the East, the producing sand pinches out.

There is apparently a well defined drainage in an Easterly direction. Complainant's lease is conceded to be one of the most favorably situated in the field. It is on what is known as the "Fairway". It has one of the thickest of the producing sand formations. It is well located on the structure and is highly desirable from the standpoint of permeability and porosity. It has so far encountered no water trouble. Complainant can produce without difficulty the oil lying under its land with the 5 wells which it has at this time. It has from time to time complained to the Commission with regard to its allowable without result. On one occasion, conceiving that the present scheme constituted nothing more than a per well basis of allocation, it applied for permit to drill a large number of additional wells. This application was generally denied, but a permit was given for one additional well, which has not been drilled.

The allowance of 20 barrels per day to all wells capable of making it, plus the amount allowed to those pumping wells incapable of making 20 barrels a day, takes up all of the top allowable of 522,500 barrels with the exception of something slightly over 7,000 barrels a day. Accordingly, the only allowable which remains to be prorated among the higher potential wells upon a potential basis is this negligible amount.

The respondents' engineers frankly admitted that the present scheme of proration is nothing more or less than one on a per well basis. Without regard to their admissions, the uncontradicted evidence manifestly shows that such is the fact. Any well that can make 20 barrels per day is allowed to make it. That portion of the top allowable not taken by the wells which lag below 20 barrels a day is assigned to the more powerful or valuable wells. Complainant's wells, which are admitted to be among the highest producers in the field, are given under this arrangement the pittance of about 2 barrels a day over other wells which admittedly could not make a fractional part of the production that complainant's wells can make.

The proration of this field on a per well basis has been considered and condemned in a number of cases before this. See People's Petroleum Producers, Inc., v. Smith et al., D. C., 1 F.Supp. 361; Peoples' Petroleum Producers, Inc., v. Lon A. Smith et al.,[1] Equity No. 386, Tyler Division,

---

[1] No opinion for publication.

Eastern District of Texas, decided March 17, 1933; Rowan & Nichols Oil Company v. Terrell et al.,[1] Equity No. 479, Tyler Division, Eastern District of Texas, decided March 17, 1933. It is unnecessary to restate the reasons given in those cases for condemning this method of proration. It is sufficient to say that it takes no account of the difference in the wells, of the richness or thickness of the sand, of the location upon the structure, of the porosity or permeability of the sand, of the estimated oil reserves, or of the acreage upon which the respective wells are situated. The worst property is raised to the level of the best and the best is lowered to the level of the worst.

The disregard of acreage alone should be sufficient to condemn the plan. Here we have a case where a producer with a well to five acres can produce no more than his neighbor who adjoins him with a well on a fraction of an acre. Under the law in Texas, this oil in place belongs to the owner of the land or the leasehold. Any plan which contemplates that any party who can get enough ground to stick a drill bit down and obtain a well is entitled to produce as much as a party who owns ten times as much acreage adjoining him is manifestly wrong. The evidence shows that in a formation like the complainant's lease, one well can sufficiently drain 10 acres. Therefore, there is no good reason why there should be 15 or 20 wells drilled upon such a leasehold. Yet that is the result if complainant is to compete with a neighbor who drills a well upon a fraction of an acre.

It is manifest that other things being equal, the party with the largest acreage has the most oil. There is nothing in this order, however, that protects him in that ownership. If a trust fund in which various parties owned different amounts of money was to be distributed, the natural assumption would be that the distribution would be on a prorata basis. If one man had $100 and another $1,000, the man with the $1,000 would get $10 for every $1 the other man got. However, suppose for some reason it was determined that either the welfare of the fund or the community dictated that each person should draw $20 per day from the fund. When the man who had $100 in the fund had drawn for five days, he would stop. The man who had $1,000 would continue to draw his $20 a day for another forty-five days.

However, under this order, a man who has less oil under his lease than his neighbor does not stop when he gets his part of the oil. He continues to go on at 20 barrels per day as long as he can get any oil either from his own land or drain it from his neighbor's. In the meantime, his better situated neighbor sits by unable to protect himself because of this unequal order.

To these matters the Commission responds that the situation in the East Texas field is difficult and no better order can be prepared. It is, of course, not the duty of the court to write a better order, nor does the obligation rest upon complainant to suggest one. The fact that regulation is difficult does not justify confiscation. The State interferes with the lawful owner of this oil upon the theory that it is conserving a natural resource. Its right to do this has been upheld in many cases unnecessary to cite. The idea was hinged originally, and must continue to stand largely, upon the theory of the prevention of waste. The public generally has no title in this oil. If its interest in it is so great that it must needs regulate it to the extent of confiscation, then it approaches the point of expropriation and it must pay for what it does. Obviously this regulation is not proceeding upon any such theory.

Respondents say that if small wells are not allowed to produce sufficiently to make them profitable they will be abandoned and there will be an economic loss. The number of these small wells is, in the opinion of the court, negligible. Furthermore, the evidence is not at all conclusive that any substantial reserves lying around these wells will be ultimately lost. Moreover, the evidence indicates that the production of these wells with the large amount of water that is brought up with the oil is even more harmful and wasteful to the field than the abandonment of those wells themselves would be. They represent a small factor in the ultimate recovery of this vast field and should not be allowed to dominate its method of production. Be that as it may, it does not follow that the loss of these small wells would justify the taking without compensation of complainant's property. This order places complainant in position where without ability to fence or fend for itself, it must stand idly by and see its oil drained by wells lying to the East. According to the figures, if nothing happens to complainant's wells

---

[1] No opinion for publication.

and water does not come in from the West, it will take twenty-eight years for it to produce its reserve under the present system of proration. On the basis of these same figures, the field generally will be depleted in about eleven years. It is manifest that the time element is important here. The Commission's engineer Cottingham frankly admitted that the present order operates unequally as to complainant, but asserted his opinion that a long period of years would equalize the matter. The question as to whether it will or not is highly problematical. The matter of present day confiscation is certain. Respondents are not entitled to require complainant to gamble as to what will happen to its oil or its markets over a period of twenty-five or thirty years.

▆▆▆▆ Furthermore, the court is not of the opinion that the evidence bears the respondents out in the contention that the present order is the only one possible. As said before, it is not the court's function to draw an order. However, the evidence is not at all clear that this 522,500 barrel top allowable is fixed solely for the prevention of waste. Respondents' engineer Hudnall frankly admitted that he was of the opinion that a higher allowable could be fixed without injury. Their chief engineer, Cottingham, did not deny that such was the case. It is manifest from all of the evidence that the allowable has been fixed with an eye to the market as well as with an eye to the prevention of waste. Complainant does not attack the idea of a top allowable. That, however, does not preclude the court from considering the matter in contemplating the reasonableness of this entire plan of proration. Furthermore, it is evident from the record that it is not necessary to allow all of these wells 20 barrels per producing day in order for them to operate. An allowance of 20 barrels is an arbitrary figure. There was no evidence to show they could not survive on less. In fact the evidence indicates the contrary. There is no reason why many of these wells should not be cut back to a position more nearly approaching their productive capacity and reserve.

The difficulty in which the Commission finds itself grows largely out of its relaxation of its own spacing rules. The drilling of thousands of wells, unnecessary so far as the public interest is concerned, has required them to listen to the demands of those well owners at the expense of other operators better situated. No effort has apparently been made to require those parties producing upon too densely drilled acreage to pool their tracts. There is no justification in law for taking complainant's property in order to recoup these parties who drilled these unnecessary wells.

The duty enjoined on the Commission by the Statute is to prevent waste. When in order to do that it has to limit production, then the Statute says it shall allocate the allowable on a reasonable basis. Further than that it is without power to go. It is not its function to repay owners for wells drilled or to guarantee them a return. It can not enrich one man at the expense of another. It is obvious that this order as enforced does not apportion the allowable so far as complainant is concerned on a reasonable basis. If it does, then complainant might as well have had five of the poorest wells as five of the best. It might just as well have bought a 1 acre lease as 25 acres. It might just as well have bought on the edge of the field as the center so long as its wells could make 20 barrels a day. The small surplus allotted on potential amounts to practically nothing and is so admitted by respondents' own engineers.

▆▆▆▆ Respondents, in an effort to extenuate the inequality of their order, suggest the difficulty presented by the marginal well law. Article 6049b, Vernon's Ann.Civ.St. Tex. This Act relates to pumping wells and so far as East Texas is concerned forbids the artificial curtailment of production below 20 barrels a day if such reduction would cause damage to the well, or loss of ultimate recovery, or premature abandonment. Their position with regard to this matter is equivocal. There are about 450 of these pumpers in the field. If, as suggested, the law applies to them, then the order of August 29, 1938, made no effort to comply with the law for the 2.32% of hourly potentials would never give these wells 20 barrels a day. Their interpretation and enforcement of the order does not do it for the two day a week shut-down cuts a 20 barrel a day allowable to about 14 barrels. All of these pumpers put together do not produce on an average over 5,500 barrels a day. Any one of complainant's wells at half its potential open flow would produce more than that.

Accordingly, it is apparent that the effect of the so-called statutory marginal wells is very slight so far as the general scheme of proration for that field is con-

cerned. The Statute offers no excuse for a flat 20 barrel allowance to other wells running up to 860 barrels per hour.

If it be conceded that the Statute is valid (which has been seriously questioned) and that these strictly marginal wells must be allowed 20 barrels a day if they can make it, still that furnishes no excuse for confiscating the property of some other producer better situated. Pumping wells of this variety might appear in a field to such an extent as to exhaust the entire allowable, thereby leaving nothing for high potential flowing wells. No such absurd result was ever intended. This Statute was obviously designed to keep these small pumpers from being slighted off, it being contemplated that the better wells would have a much higher allowable. If, however, this marginal minimum must be considered as a component element of a proration scheme, thereby unreasonably reducing the allowables of other better wells, either the Statute or the scheme must fall.

There is no merit in the contention that complainant is estopped to attack this order because of laches. In the first place this order applied and enforced as the Commission now interprets it is not the same order which existed over the period of years during which the field has been regulated. The continual increase in drilling has operated to make this system of proration progressively more oppressive until the present administration of the order has in effect put the field upon a per well basis. The potential factors of the order have practically become nil. Furthermore, the record shows that the complainant has constantly protested to the Commission with regard to enforcement of the order, without result. It has attempted to relieve itself by applying for permits to drill additional wells, however unnecessary they might be in the production of its property. Further than that, the matter involved here now is one of confiscation. The orders have been submitted to under the threat of penalties. The right to assert complainant's constitutional rights has not been lost.

The court is not attempting here to pass upon the order generally or upon the rights of anyone with reference to it save those of complainant. In so far as complainant is concerned, the court is of the opinion upon the evidence and the law that the order as applied and enforced is confiscatory and void. The complainant has

not, however, prayed the court for a sweeping writ allowing it to produce its wells without restriction. It only asks for what it considers its fair share of the allowable as now fixed for the field. It is the opinion of the court that it is entitled to such an injunction restraining the respondents from interfering with it in so producing its property. The matter of the character of the decree, including the question as to the amount to be produced pending appeal or the promulgation of a new order by the Commission, may be settled on notice.