RAILROAD COMMISSION OF TEXAS ET AL. *v.* ROWAN & NICHOLS OIL CO.

No. 681. Argued April 24, 25, 1940.—Decided June 3, 1940.

*Mr. James P. Hart,* Assistant Attorney General of Texas, with whom *Messrs. Gerald C. Mann,* Attorney General, and *W. F. Moore,* First Assistant Attorney General, were on the brief, for petitioners.

*Mr. Dan Moody,* with whom *Mr. Rice M. Tilley* was on the brief, for respondent.

By leave of Court, briefs were filed by *Messrs. J. N. Saye* and *W. T. Saye,* and by *Mr. Norman L. Meyers,* on behalf of a number of owners and operators, as *amici curiae,* urging reversal.

MR. JUSTICE FRANKFURTER delivered the opinion of the Court.

The question before us is the validity, when challenged by appeal to the Fourteenth Amendment, of an oil proration order promulgated by the Railroad Commission of Texas, insofar as it applies to the respondent's wells.

To safeguard its oil resources Texas has devised a regulatory scheme for their production, and has placed its administration in the Railroad Commission's hands. Revised Civil Statutes, Arts. 6014 *et seq.* In conformity with this statute, which has familiar procedural provisions, the Commission in the fall of 1938 issued the assailed proration order covering the East Texas oil field, where respondent's wells are located. By this order each well was allowed to produce 2.32% of its "hourly potential"—that is, 2.32% of its hourly productive capacity under unrestricted flow. But the practical operation of this order was largely cut across by allowances made to "marginal wells." These are wells which, if their low productive capacity were legally curtailed, would have to be prematurely abandoned. Therefore the Texas statute gives them a special status. In accord with its policy toward these marginal wells, the Commission freed them from the burden of its hourly potential formula by allowing them production up to twenty barrels a day. Because of the large number of these low capacity units in the East Texas field, approximately 385,000 barrels out of a total daily "allowable" of 522,000 barrels were exempt from the restricting formula, leaving only about 136,000 for the class within which respondent's wells fell. Application to them of the hourly potential formula resulted in an allotment of only about twenty-two barrels a day to each well. Claiming that such a mode of regulation disregarded its right to the oil in place beneath its leases, respondent sought and obtained a decree from the District

Court for the Western District of Texas enjoining the Commission from carrying its proration plan into effect. 28 F. Supp. 131. With modification not here relevant the Circuit Court of Appeals affirmed the decree. 107 F. 2d 70. We brought the case here by certiorari, 309 U. S. 646, because of the importance of the matter in the administration of the Texas law and kindred conservation statutes.

As sustained by the findings of the District Court and accepted by the Circuit Court of Appeals, respondent's claims may be summarized by what follows. The Commission's proration formula as applied permits other leaseholders, more leniently treated, to capture oil at a more rapid rate than is possible for the respondent, thereby draining away oil which underlies respondent's leased lands. This is due both to the allocating formula itself, and more especially to the permission granted marginal wells to produce without limit up to twenty barrels a day. The "potential" method of allocation fails to give sufficient weight to relevant factors in the measurement of oil in place, especially to the depth of respondent's reserves situated in the "Fairway," a deep and rich portion of the East Texas field. Only an allocation based upon acre-feet of sand or its equivalent would be a reasonable means of measuring the oil in place beneath respondent's leases; and any formula failing to do this takes respondent's property without due process of law. Moreover, the allowance made to marginal wells absorbs so much of the total "allowable" as to make the Commission's order in effect an allocation on a flat per well basis, regardless of great variation in the capacity of the wells and the density with which different leases have been drilled. An important factor in producing this result is the permission frequently granted by the Commission, under power conferred upon it by statute, for departure from its spacing and drilling rules whereby the field has

been drilled with an irregular density. As a consequence, the more densely drilled tracts adjoining respondent's leases may, by virtue of their marginal allowances, produce oil in such quantities as to drain away respondent's reserves. Such is the basis for respondent's resistance to the order.

Underlying these claims is as thorny a problem as has challenged the ingenuity and wisdom of legislatures. In major part it was created by the discovery of vast oil resources and by their development under rules of law fashioned in the first instance by courts on the basis of analogies drawn from other fields of the common law. In Texas, according to conventional doctrine, the holder of an oil lease "owns" the oil in place beneath the surface. *Lemar* v. *Garner*, 121 Tex. 502; 50 S. W. 2d 769; *Stephens County* v. *Mid-Kansas Oil & Gas Co.*, 113 Tex. 160; 254 S. W. 290; 1 Summers, Oil and Gas (2nd ed.), p. 16. But equally recognized is the "rule of capture" which subjects the lessee's interest to his neighbors' power to drain his oil away. Therefore, to speak of ownership in its relation to oil, is to imply a contingency of control not applicable to ordinary interests in realty. See Ely, The Conservation of Oil, 51 Harv. L. Rev. 1209, 1218–22. Each leaseholder, that is to say, is at the mercy of all those who adjoin him, since oil is a fugacious mineral, the movements of which are not confined by the artificial boundaries of surface tracts. This gap between the geological nature of the oil pool and the formal surface rights of the lessees is frequently bridged by the drilling of "offset wells" at the boundary of each surface tract, so that owners may protect themselves against the exercise of one another's capture rights. Partly to mitigate the undesirable consequences of this unsystematized development, the oil-producing states, Texas among them, have enacted conservation laws with appropriate administrative mechanisms to control drilling and production. The

general scheme of the Texas statute is not challenged. Its constitutionality is here settled. *Champlin Refining Co.* v. *Commission,* 286 U. S. 210.

But merely writing laws is only the beginning of the matter. The administration of these laws is full of perplexities. State agencies have encountered innumerable difficulties in trying to adjust the many conflicting interests which grow out of the rule of capture and its implications. The experience of Texas illustrates that a brood of litigation almost inevitably follows the inherent empiricism of these attempted solutions. See Ely, *op. cit. supra,* at pp. 1225–29; Marshall and Meyers, The Legal Planning of Petroleum Production: Two Years of Proration, 42 Yale L. J. 701. For some years the Texas Commission has been engaged in experimental endeavor to devise appropriate formulas for a fair allotment of the allowable production. The commitment of such a delicate task to the administrative process has not escaped challenge in the courts, and at times the challenge has been successful. Compare *MacMillan* v. *Railroad Commission,* 51 F. 2d 400; *Constantin* v. *Smith,* 57 F. 2d 227; *Peoples' Petroleum Producers* v. *Smith,* 1 F. Supp. 361; *Amazon Petroleum Corp.* v. *Railroad Commission,* 5 F. Supp. 633. But such cases are only episodes in the evolution of adjustment among private interests and in the reconciliation of all these private interests with the underlying public interest in such a vital source of energy for our day as oil. Certainly so far as the federal courts are concerned the evolution of these formulas belongs to the Commission and not to the judiciary. Except where the jurisdiction rests, as it does not here, on diversity of citizenship, the only question open to a federal tribunal is whether the state action complained of has transgressed whatever restrictions the vague contours of the Due Process Clause may place upon the exercise of the state's regulatory power. A controversy like this always calls

for fresh reminder that courts must not substitute their notions of expediency and fairness for those which have guided the agencies to whom the formulation and execution of policy have been entrusted.

General as these considerations may be, they are decisive of the present case. Both the District Court and the Circuit Court of Appeals appear to have been dominated by their own conception of the fairness and reasonableness of the challenged order. For all we know, the judgment of these two lower courts may have been wiser than that of the Commission, and their standard of fairness a better one. But whether a system of proration based upon hourly potential is as fair as one based upon estimated recoverable reserves or some other factor or combination of factors, is in itself a question for administrative and not judicial judgment. According to the Commission's experts, theories of allocation urged by the respondent and accepted by the courts below would in fact give to respondent more than its fair share of the oil in the field. Respondent, the Commission's witnesses contend, would gain undue benefit from the constant eastward migrations of oil caused by the gradual influence of subsurface pressure gradients—and this at the expense of other lessees in geologically less fortunate portions of the field. The Commission's experts further insisted that, though much technical progress has been made, estimates of recoverable reserves beneath the surface of a particular tract remain largely an indeterminate venture; and that hourly potential actually takes into account, at least in some measure, all relevant factors for ascertaining recoverable reserves. Certainly in a domain of knowledge still shifting and growing, and in a field where judgment is therefore necessarily beset by the necessity of inferences bordering on conjecture even for those learned in the art, it would be presumptuous for courts, on the basis of conflicting expert testimony, to deem the view of the ad-

ministrative tribunal, acting under legislative authority, offensive to the Fourteenth Amendment. Compare *South Carolina Highway Dept.* v. *Barnwell Bros.*, 303 U. S. 177, 191, *et seq.*

Equally enmeshed in a conflict of *expertise* is the claim most vigorously urged by respondent that, taken in connection with exceptions made by the Commission to its spacing rules and with the unrestricted twenty barrel allowance to marginal wells, the proration order substantially places production on a flat per well basis. Such a result, according to respondent's claim as accepted by the lower courts, gives a constitutionally inadmissible advantage to smaller and more densely drilled tracts as against those owned by respondent. But this claim really presents a more specialized aspect of the general problem. In regulating flow of production the treatment to be accorded to small and irregularly shaped tracts which do not fit neatly into the Commission's general scheme for spacing, has presented a difficulty almost as great as the framing of proration formulas. Compare Walker, The Problem of the Small Tract under Spacing Regulations, 17 Tex. L. Rev. 157 (Supp. Bar Association Proceedings). To deny the holders of these tracts permission to drill might subject them to the risk of losing their oil in place or of being put at the mercy of adjoining holders. In many instances, therefore, the Commission has granted exceptions to its general spacing rule on the basis of which investments have been made and wells drilled. If these wells, most of them small, were restricted to production on the basis of an hourly potential formula, it might be unprofitable to operate them at all. Not only are the individual interests of these small operators involved, but their effect on the state's economy is an appropriate factor to be taken into account when plans are devised to keep the wells open.

A flat per well allowance to these producers was not an unnatural answer to the problem. Whether, as contended by the respondent, the maximum figure set by the Commission is too high in that it leads to the capture of oil from beneath its leases by neighboring operators, and whether a lower limit might suffice to assure profitable production—these questions take us into that debatable territory which it is not the province of federal courts to enter. The record is redolent with familiar dogmatic assertions by experts equally confident of contradictory contentions. These touch matters of geography and geology and physics and engineering. No less is there conflict in the evidence as to the solidity of respondent's apprehension that there will be drainage of the oil beneath its surface by neighboring wells. The Commission's experts insist that the threat, if existent at all, is speculative, and that the Commission's power of continuous oversight is readily available for relief if real danger should arise in the future.

Plainly these are not issues for our arbitrament. The state was confronted with its general problem of proration and with the special relation to it of the small tracts in the particular configuration of the East Texas field.[1] It has chosen to meet these problems through the day-to-day exertions of a body specially entrusted with the task because presumably competent to deal with it. In striking the balances that have to be struck with the compli-

---

[1] We are here not concerned with a statute, or orders under it, not thought to enforce state policy "for the prevention of waste, and the protection of correlative rights of owners in the common pool," but directed solely "to compel those who may legally produce, because they have market outlets for permitted uses, to purchase gas from potential producers whom the statute prohibits from producing because they lack such a market for their possible product." *Thompson* v. *Consolidated Gas Corp.*, 300 U. S. 55, 69, 77.

cated and subtle factors that must enter into such judgments, the Commission has observed established procedure. If the history of proration is any guide, the present order is but one more item in a continuous series of adjustments. It is not for the federal courts to supplant the Commission's judgment even in the face of convincing proof that a different result would have been better.

The challenged decree must therefore be

*Reversed.*

MR. JUSTICE ROBERTS, dissenting:

The petitioners' proration order is challenged not merely as unfair or unreasonable but as confiscatory of the respondent's property. Upon the allegations of the bill, the District Court had jurisdiction. Although the problem of proration presented technical and difficult questions, and although the Commission was vested with a broad discretion in dealing with them, these facts could not justify the court's abdicating its jurisdiction to test the Commission's order. The case was tried *de novo* and neither the full record made before the Commission nor its findings appear in the evidence, except for what is contained in the Commission's orders. After a painstaking trial, and upon detailed and well supported findings of fact, the court reached the conclusion that the order worked a confiscation of respondent's property.[1] The court said: "The respondents' [petitioners'] engineers frankly admitted that the present scheme of proration is nothing more or less than one on a per well basis." Referring to such a basis, the court added: "It is sufficient to say that it takes no account of the difference in the wells, of the richness or thickness of the sand, of the

---

[1] 28 F. Supp. 131.

location upon the structure, of the porosity or permeability of the sand, of the estimated oil reserves, or of the acreage upon which the respective wells are situated. The worst property is raised to the level of the best and the best is lowered to the level of the worst." The court concluded that the order operated to appropriate, for the benefit of others, the respondent's oil without compensation.

The Circuit Court of Appeals approved and adopted the findings and conclusions of the District Court.[2]

The opinion of this court, in my judgment, announces principles with respect to the review of administrative action challenged under the due process clause directly contrary to those which have been established. A recent exposition of the applicable principles is found in the opinion of Mr. Justice Brandeis, written for a unanimous court, in *Thompson* v. *Consolidated Gas Utilities Corp.*, 300 U. S. 55, dealing with a proration order affecting gas, entered by the same commission which entered the order here in issue. I think that adherence to the principles there stated requires the affirmance of the decree.

The CHIEF JUSTICE and MR. JUSTICE MCREYNOLDS join in this opinion.

---

[2] 107 F. 2d 70.