The MINNEAPOLIS & ST. LOUIS RY. CO., Plaintiff,

and

New York, Chicago & St. Louis Railroad Co., State of South Dakota, and Public Utilities Commission of The State of South Dakota and State of Minnesota, and Minnesota Railroad & Warehouse Commission, Intervening Plaintiffs,

v.

UNITED STATES of America,

and

Interstate Commerce Commission, Defendants,

and

The Atchison, Topeka & Santa Fe Ry. Co., The Pennsylvania Railroad Co. and Pennsylvania Company, The City of Peoria, The City of East Peoria and The Peoria Assoc. of Commerce, The State of Illinois, The Shippers Along The Lines of The Toledo, Peoria & Western Railroad Co., City of Bushnell, Illinois, Bushnell Chamber of Commerce; City of Canton, Illinois, Canton Chamber of Commerce; City of LaHarpe, Illinois, LaHarpe Golden Rule Club; Village of Lomax, Illinois; City of Keokuk, Iowa, Keokuk Chamber of Commerce, Keokuk Bridge Commission, The Hubinger Company, Keokuk; City of Warsaw, Illinois, Warsaw Chamber of Commerce; City of Forrest, Illinois; City of Fairbury, Illinois; City of Gridley, Illinois; City of Gilman, Illinois; City of Sheldon, Illinois; City of Watseka, Illinois; City of Eureka, Illinois; Village of Secor, Illinois; City of Washington, Illinois; City of Chenoa, Illinois, Intervening Defendants.

No. 4–57–Civ. 123.

United States District Court
D. Minnesota,
Fourth Division.

Sept. 16, 1958.

894

Richard Musenbrock and William J. Powell, Minneapolis, Minn., for plaintiff. Dorsey, Owen, Barker, Scott & Barber, Minneapolis, Minn., of counsel.

Philip Stringer, St. Paul, Minn., and Thomas O. Broker, Cleveland, Ohio, for intervening plaintiff New York, Chicago & St. Louis Railroad Company.

Phil Saunders, Atty. Gen., and Herman L. Bode, Asst. Atty. Gen., for intervening plaintiff State of South Dakota, and Public Utilities Commission of the State of South Dakota.

Miles Lord, Atty. Gen., and Harold J. Soderberg, Jr., Asst. Atty. Gen., for intervening plaintiffs State of Minnesota and Minnesota Railroad & Warehouse Commission.

George E. MacKinnon, U. S. Dist. Atty., St. Paul, Minn., Victor R. Hansen, Asst. Atty. Gen., James E. Kilday and P. James W. Underwood, Attys., Dept. of Justice, Washington, D. C., for defendant United States.

Robert W. Ginnane, Gen. Counsel, Washington, D. C., and B. Franklin

Taylor, Jr., Asst. Gen. Counsel, Washington, D. C., for defendant Interstate Commerce Commission.

R. S. Outlaw, Starr Thomas, Carl E. Bagge, Chicago, Ill., for intervening defendant Atchison, Topeka & Santa Fe Ry. Co.

Edwin A. Lucas, Philadelphia, Pa., and Robert H. Bierma, Chicago, Ill., for intervening defendants Pennsylvania R. Co. and Pennsylvania Co. Richards, Janes, Montgomery & Cobb, Minneapolis, Minn., of counsel.

Max J. Lipkin, Peoria, Ill., for intervening defendant City of Peoria.

Fred V. Stiers, East Peoria, Ill., for intervening defendant City of East Peoria.

Verle W. Safford, Peoria, Ill., for intervening defendant Peoria Association of Commerce.

Latham Castle, Atty. Gen., Chicago, Ill., for intervening defendant State of Illinois. Harry H. Peglay, Special Asst. Atty. Gen., of counsel.

Robert H. Walker, Keokuk, Iowa, for intervening defendants Communities and Shippers along the lines of the Toledo, Peoria & Western Railroad Company. Boyd, Walker, Huiskamp & Concannon, Keokuk, Iowa, and Cant, Taylor, Haverstock, Beardsley & Gray, Minneapolis, Minn., of counsel.

Before SANBORN, Circuit Judge, and NORDBYE and DEVITT, District Judges.

PER CURIAM.

This is an appeal by the Minneapolis & St. Louis Ry. Co. (Minneapolis) from an order of the Interstate Commerce Commission approving the acquisition of control jointly by the Pennsylvania Company and through the latter, the Pennsylvania Railroad Company (Pennsylvania) and the Atchison, Topeka & Santa Fe Railway Company (Santa Fe) of the Toledo, Peoria & Western Railroad Company (Western) under Section 5(2) of the Interstate Commerce Commission Act (49 U.S.C.A. § 5(2). Subsequently, the intervening parties were joined.

The report and decision of the Commission's Division 4, dated May 31, 1957, is recorded in 295 I.C.C. 523. The full Commission denied reconsideration and reargument on October 30, 1957. By these orders the Commission granted the application of the Pennsylvania and Santa Fe, subject to the conditions set out in the footnote,[1] to acquire joint con-

1. "1. That under the control of the Santa Fe and the Pennsylvania, the Western shall maintain and keep open all routes and channels of trade via existing junctions and gateways, unless and until otherwise authorized by us;

"2. The present neutrality of handling traffic inbound and outbound and in overhead service by the Western shall be continued so as to permit equal opportunity for service to and from all lines reaching the rails of that carrier without discrimination as to routing or movement of traffic, and without discrimination in the arrangements of schedules or otherwise;

"3. The present traffic and operating relationships existing between the Western, on the one hand, and all lines connecting with its tracks, on the other, shall be continued insofar as such matters are within the control of the Santa Fe or the Pennsylvania;

"4. The Western shall accept, handle, and deliver all cars inbound and outbound and in overhead service, loaded and empty, without discrimination in promptness or frequency of service as between cars destined to or received from competing carriers and irrespective of destination or route of movement;

"5. The Santa Fe and/or the Pennsylvania shall not do anything to restrain or curtail the right of industries located on the Western to route traffic over any or all existing routes and gateways;

"6. The Santa Fe and Pennsylvania shall refrain from closing any existing route or channel of trade with any carrier party to this proceeding on account of their control of the Western, unless and until otherwise authorized by us; and

"7. Any party or any person having an interest in the subject matter may at any future time make application for such modification of the above-stated conditions, or any of them, as may be required in the public interest, and jurisdiction will be retained to reopen the proceeding on our own motion for the same purpose."

trol of the Western, dismissed the application of the Minneapolis & St. Louis Railway Company (Minneapolis) to acquire control of Western through stock ownership, and denied the petitions of New York, Chicago & St. Louis Railroad Company (Nickel Plate) and the Chicago, Rock Island & Pacific Railroad Company (Rock Island) for participation in the stock ownership and control of Western.

Western is approximately 240 miles long. It extends across the northern part of Illinois from Effner on the east through Peoria to Lomax, Illinois, and Keokuk, Iowa, on the west. It connects with the Pennsylvania at Effner, with the Santa Fe at Lomax, with the Rock Island and the Chicago, Burlington & Quincy (Burlington) at Keokuk, with the Minneapolis and Nickel Plate at Peoria. All told, Western has connections for interchange of traffic with 16 railroads. More than two-thirds of its total revenues are derived from overhead or bridge traffic, traffic that is received from one railroad to be delivered to another. Little of its revenue is produced by purely local traffic.

Western has outstanding 90,000 shares of capital stock, 73,800 of which are held by the trustees of the estate of George P. McNear, Guy A. Gladson and Wilmington Trust Company. McNear had acquired the property in 1927, after the unsuccessful operation of it by Pennsylvania and Burlington had ended in receivership. Under his ownership and operation the road became highly successful and a valuable property. Western occupied a strategic position by passing as it did, the congested terminals of Chicago and St. Louis. It seems that much of its success came after the construction of a Western connection with the Santa Fe at Lomax. For the year ended June 30, 1955, approximately 70% of the cars of interchange traffic and of Western gross revenues were attributable to the Pennsylvania and the Santa Fe. The Burlington and the New York Central Railroad Company ranked third and fourth in the volume of interchange,

and Rock Island, Nickel Plate, and Minneapolis followed, in that order.

The trustees of the McNear Estate proposed to dispose of the capital stock of Western for $135 a share. Santa Fe agreed to pay that price after Minneapolis had offered $133. Santa Fe allowed Pennsylvania to have half of the stock, subject, of course, to approval by the I. C. C. It is apparent that Santa Fe and Pennsylvania did not favor acquisition of Western by Minneapolis or participation in ownership and control by Nickel Plate and Rock Island.

Minneapolis, supported by the Minnesota and South Dakota plaintiffs, contends, in effect, that, under the evidence and the applicable law, the Commission could not approve the acquisition of the control of Western by the Pennsylvania and the Santa Fe, and should have approved the application of Minneapolis, which would have resulted in a consolidation with increased efficiency and economy in management.

Minneapolis argues that the orders in suit are invalid for the following reasons: (1) Pennsylvania had violated Section 10 of the Clayton Act, 15 U.S.C.A. § 20, since it and the Wilmington Trust Company, co-trustee of the McNear estate, had directors in common; (2) the acquisition violates Section 1 of the Sherman Act, 15 U.S.C.A. § 1 and Section 7 of the Clayton Act, 15 U.S.C.A. § 18; (3) the Commission failed to accord Minneapolis a true comparative hearing; and (4) the findings of the Commission lack adequate evidentiary support.

The Nickel Plate, which, with the Rock Island, had intervened in the proceedings before the Commission, requested equal participation and ownership of Western with whichever carrier or carriers might be authorized to acquire stock control. Rock Island did not intervene herein. Nickel Plate argues that the Commission failed to make findings on material issues relating to the effect that control by Pennsylvania and Santa Fe would have on competitors and

on the general competitive situation in the industry, and that if control of Western is awarded to any carrier to the exclusion of Nickel Plate, the neutrality of Western will be destroyed, to its detriment and that of Nickel Plate.

The applications for the control of Western were filed under 49 U.S.C.A. § 5(2), which, so far as pertinent, provides:

"(a) It shall be lawful, with the approval and authorization of the Commission, as provided in subdivision (b)—

"(i) * * * for any carrier, or two or more carriers jointly, to acquire control of another through ownership of its stock * * *

"(b) * * * If the Commission finds that, subject to such terms and conditions and such modifications as it shall find to be just and reasonable, the proposed transaction is within the scope of subparagraph (a) and will be consistent with the public interest, it shall enter an order approving and authorizing such transaction, upon the terms and conditions, and with the modifications, so found to be just and reasonable: * * *"

Section 5(11) of Title 49 U.S.C.A. contains this provision:

" * * * any carriers or other corporations, and their officers and employees and any other persons, participating in a transaction approved or authorized under the provisions of this section shall be and they are hereby relieved from the operation of the antitrust laws and of all other restraints, limitations, and prohibitions of law, Federal, State, or municipal, insofar as may be necessary to enable them to carry into effect the transaction so approved or provided for in accordance with the terms and conditions, if any, imposed by the Commission, and to hold, maintain, and operate any properties and exercise any control or franchises acquired through such transaction. * * *"

From these statutes, it would appear that notwithstanding the antitrust laws and all other legal restraints or obstacles, the Interstate Commerce Commission may, if it determines that it is consistent with the public interest and with the transportation policy of the United States, authorize a carrier or carriers to acquire control of another carrier by purchase of its capital stock. Since Congress has empowered the Commission, and not the courts, to determine whether the acquisition of control of one carrier by another or by others is consistent with the public interest, the determination of the Commission may not be set aside unless it can be said that there is no rational basis for it. Canadian Pacific Railway Co. v. United States, D.C., 158 F.Supp. 248, 251, 252 and cases cited.

That this Court would or might have arrived at a different conclusion, had it had the duty and responsibility of deciding the controversy between the applicants, is of no consequence.[2]

It must be remembered that, within the limits of the jurisdiction conferred upon it, the power of a court or an administrative agency to decide questions is not confined to deciding them correctly. Thompson v. Terminal Shares, Inc., 8 Cir., 89 F.2d 652, 655; Pittsburgh Plate Glass Co. v. National Labor Relations Board, 8 Cir., 113 F.2d 698, 701.

"A controversy like this always calls for fresh reminder that courts must not substitute their notions of expediency and fairness for those which have guided the agencies to whom the formulation and execution of policy have been en-

2. It will be to no purpose to discuss the contentions of Minneapolis that Pennsylvania was primarily motivated in acquiring an interest in Western by a desire to thwart the plans of Minneapolis. The Commission had no authority to direct the trustees to deal with Minneapolis rather than with the other interested purchasers.

trusted." Railroad Commission of Texas v. Rowan & Nichols Oil Co., 310 U.S. 573, 580–581, 60 S.Ct. 1021, 1024, 84 L. Ed. 1368; Pittsburgh Plate Glass Co. v. National Labor Relations Board, supra, 113 F.2d at page 701.

Considering now the contentions of the parties, Minneapolis lays principal stress on the argument that the Pennsylvania and the Wilmington Trust Company, co-trustee of the McNear estate, violated Section 10 of the Clayton Act since each of them had directors in common.[3] Its position is that while the exception provision, Section 5(11), quoted above, may be applicable to Section 7 of the Clayton Act, it is not applicable to Section 10.

■ However, a reading of Section 5(11) would indicate that the authority vested in the Commission is not only broad, but it is explicitly made "exclusive and plenary." The Commission having found that the acquisition of the Santa Fe and Pennsylvania is in the public interest, it would seem to follow that any antitrust restrictions or prohibitions would become inoperative. In passing, it may be pointed out that here the Wilmington Trust Company is functioning in a fiduciary capacity as Trustee in the interest of the beneficiaries of the trust. We do not have a situation where interlocking directors may be enriched by reason of dealings in their securities and thus should be required to sell securities only to a bidder whose "bid is most favorable to the common carrier." Section 10 should be quoted. It reads, in part:

"No common carrier engaged in commerce shall have any dealings in securities, supplies, or other articles of commerce, or shall make or have any contracts for construction or maintenance of any kind, to the amount of more than $50,000, in the aggregate, in any one year, with another corporation, firm, partnership, or association when the said common carrier shall have upon its board of directors or as its president, manager, or as its purchasing or selling officer, or agent in the particular transaction, any person who is at the same time a director, manager, or purchasing or selling officer of, or who has any substantial interest in, such other corporation, firm, partnership, or association, unless and except such purchases shall be made from, or such dealings shall be with, the bidder whose bid is the most favorable to such common carrier, to be ascertained by competitive bidding under regulations to be prescribed by rule or otherwise by the Interstate Commerce Commission." 15 U.S.C.A. § 20.

A mere reading of this section would indicate that the common directorate which existed between the Wilmington Trust Company and the Pennsylvania Company was not the kind intended by the Congress to be covered by the prohibition. It does not appear to cover the sale of stock held by a trust company to a common carrier. This section apparently was designed to prevent a railroad company from buying securities without receiving competitive bids from prospective sellers. There is no language in Section 10 which pertains to any competitive bidding by the railroad company. In any event, Section 10 is a part of the antitrust laws. See 15 U.S.C.A. § 12. And the immunity granted by Section 5(11) is applicable thereto.

■ Finally, it should be added that the United States Supreme Court has made it clear that the Interstate Commerce Commission is vested with authority to relieve proposed acquisitions of

---

3. It should be pointed out that it is the Pennsylvania Company, the wholly-owned subsidary of Pennsylvania Railroad, which seeks to acquire 50% of Western stock. The Pennsylvania Company is not engaged in railroad operations nor does it operate carrier property. Section 10 refers only to a "common carrier engaged in commerce". While this distinction may not be of controlling importance, it should be mentioned.

one railroad by another from the operations of the antitrust laws. For it to do so is consistent with the conditions set out by the Congress in the National Transportation Policy of 1940, 49 U.S.C.A. preceding section 1. In McLean Trucking Co. v. United States, 321 U.S. 67, at pages 84–85, 64 S.Ct. 370, at page 379, 88 L.Ed. 544, the Court said:

" * * * there can be little doubt that the Commission is not to measure proposals for all-rail or all-motor consolidations by the standards of the anti-trust laws. Congress authorized such consolidations because it recognized that in some circumstances they were appropriate for effectuation of the national transportation policy. It was informed that this policy would be furthered by 'encouraging the organization of stronger units' in the motor carrier industry. And in authorizing those consolidations it did not import the general policies of the antitrust laws as a measure of their permissibility."

And on page 87 of 321 U.S., on page 381 of 64 S.Ct.:

"In short, the Commission must estimate the scope and appraise the effects of the curtailment of competition which will result from the proposed consolidation and consider them along with the advantages of improved service, safer operation, lower costs, etc., to determine whether the consolidation will assist in effectuating the over-all transportation policy. Resolving these considerations is a complex task which requires extensive facilities, expert judgment and considerable knowledge of the transportation industry. Congress left that task to the Commission 'to the end that the wisdom and experience of that Commission may be used not only in connection with this form of transportation, but in its coordination of all other forms.' 79 Cong.Rec. 12207. 'The wisdom and experience of that commission,' not of the courts, must determine whether the proposed consolidation is 'consistent with the public interest.' [Citing cases]. If the Commission did not exceed the statutory limits within which Congress confined its discretion and its findings are adequate and supported by evidence, it is not our function to upset its order."

While this language was used with reference to consolidation in the motor truck industry, it is applicable here.

However, Minneapolis stresses the alleged stifling competition by the so-called oligopolistic control by two major railroads of a strategic bridge line whose independence heretofore assured Minneapolis access to its most important gateway. It reasons that the mere recital in the findings of the Commission as to the extensive mileage, large revenues, and manifest prosperity of these two great railroad systems, compels the conclusion that the acquisition of Western would violate Section 1 of the Sherman Act and Section 7 of the Clayton Act. Minneapolis contends, therefore, that the Commission must weigh the violation of the antitrust laws against all other relevant factors and base its conclusion on adequate findings.

■ At the outset, it may be observed that, merely because these two large railroad systems have acquired a 240-mile railroad under joint control, does not in and of itself justify a finding that there will be an oligopolistic control which stifles competition. It is not the function of the Commission to determine whether the acquisition of Western by these two railroads will violate the antitrust laws. The Commission has not attempted to do so and can make no definitive decision as to whether or not the contemplated transaction will result in a restraint of trade or a monopoly which is forbidden by law. McLean Trucking Co. v. United States, supra, 321 U.S. at page 79, 64 S.Ct. at page 376.

■ Suffice it to say that the Commission did give due consideration to

the effect of the acquisition on competing carriers and the possible curtailment of competition, and weighed such factors as against the broad question of public interest. We recognize that the Commission's expertise is not infallible, but where there is no question as to the Commission's having given consideration to the effect of curtailing competition in the light of the National Transportation Act, and where its conclusions are not without substantial foundation, we cannot substitute our judgment for that of this administrative agency. Whether dire competitive consequences will occur, as predicted by Minneapolis and Nickel Plate by reason of the acquisition approved by the Commission, is a matter to which its attention was directed. It concluded that any adverse competitive results were far outweighed by the safe, adequate and efficient services which would inure to the public as a result of such acquisition.

Minneapolis next urges that its application was not given a true comparative consideration by the Commission. The Commission pointed out that the proceedings before it concerned two applications for control. The two applications were consolidated and submitted on a single record and disposed of in one decision. Apparently the lack of contract by Minneapolis with the trustees did not deprive it of a full and complete hearing before the Commission. As noted above, the Commission considered the advantages and disadvantages of integration of Western with Minneapolis, and with respect thereto it considered and weighed the reasons why the Santa Fe and Pennsylvania proposal was more consistent with public interest. We cannot say that the Commission acted arbitrarily, or that it did not evaluate the two competing proposals in light of the public interest. The advantages to Minneapolis in adding Western to its railway system seems apparent. No doubt Minneapolis would be materially strengthened by its proposed integration with Western. But obviously the advantages to Minneapolis was only one of the considerations and factors which the Commission had to weigh and evaluate.

The plan which Minneapolis proposes is to abolish Western as an independent carrier, and that plan is strongly opposed, not only by the carriers and other defendants who have intervened herein, but also by many communities and industries in Illinois and Iowa, as well as the employees of Western. The removal of the offices of Western and its key personnel to Minneapolis is strongly protested. The large savings which allegedly were to follow upon in integration of Minneapolis and Western, as asserted by Minneapolis, was weighed and considered by the Commission. Likewise, the alleged economic harm which would ensue to other carriers under Minneapolis' plan to establish coordinated schedules between it and the many other lines which intersect with Western was considered by the Commission. Whether upon integration there would be such a diversion of traffic to Minneapolis which would be harmful to other carriers is a matter that the Court should not attempt to determine. Such questions are peculiarly for the Commission to decide, and we cannot say that the evidence as to such harm is not substantial. It may be noted that, of the $1,770,945 reduction in combined operating expense of Minneapolis and Western if integration took place, $1,327,062 would result from the elimination of some 256 positions now occupied by employees of Western. Whether such economies outweigh the alleged detriment to Western's employees, to its local industries and communities, and to other carriers, is also a matter which is clearly within the sound judgment of the Commission.

Nickel Plate's principal contention is that the Commission failed to make adequate findings on the general competitive situation, primarily with reference to the eastern territory of the United States. Nickel Plate states that the Commission's failure to analyze the effect on competition when railroads the size of Pennsylvania and Santa Fe take over Western and fail to make specific

findings in that regard, is fatal to the validity of its order. However, the Commission was fully cognizant of the competitive situation in the light of the proposed acquisition, but it concluded that the other carriers' interchanging traffic with Western would not be injured. It specifically emphasized the protection which would be afforded carriers exchanging traffic with Western in view of the checks and balances ingrained in a system where the ownership is divided equally between the largest connecting carrier in the East and the largest in the West. If the Commission is sound in its prediction that the connecting and immediate competing carriers of Western will not be injured by the acquisition and that competition generally will not be unduly curtailed, it would not seem necessary for the Commission to discuss the question of any alleged monopolistic threat to the eastern railroads or as to the nation as a whole. None of the so-called eastern railroads have intervened here. Moreover, it may be pointed out that Western is not the only strategic bridge line from the Middlewest to the eastern carriers. There are other carriers that bisect the same east and west area and are in direct competition with Western. Such factors were undoubtedly given due consideration, by the Commission. We cannot say that the Commission's conclusion that the patent self-interest of these two large railroads, with the restrictions imposed upon them in the ownership of Western's operations as an independent railroad tends to insure an operation which will be consistent with the public interest, is erroneous.

The Commission specifically found that "Public interest demands that the present policies of Western in all respects be continued." It concluded that this result would be attained if the two carriers which had contributed the greatest volume of traffic with Western, one from the East and one from the West, should be accorded joint ownership. As stated, it appears that some 70% of Western's interline traffic is exchanged with these two railroads. This constitutes about two-thirds of Western's total traffic. Nickel Plate has not substantiated its position that the Commission acted arbitrarily in denying it the right to participate in the ownership of Western's stock. The Commission concluded that "Any reduction in the ownership interest of the Santa Fe and the Pennsylvania by the inclusion of other carriers in the control of Western would be accompanied by an equivalent reduction in their economic incentive for future development of Western and the territory served by it." That this deduction is a sound appraisal of the situation cannot be characterized as unsupported by the evidence. It is entirely reasonable to expect that the two carriers, which are largely responsible for the excellent condition of Western today, will, by sheer self-interest, continue with the same incentive in the future.

The Commission might have granted the application of Minneapolis for sole control and ownership, which was strenuously opposed by all those carriers who wanted Western to remain independent and neutral. The Commission might have authorized the Rock Island and the Nickel Plate to join the Pennsylvania and the Santa Fe in joint ownership and control of Western. The Commission concluded that the application of Pennsylvania and Santa Fe was consistent with the public interest and should be granted. That, we think, under the evidence and the law, it had power to do; and, even if that conclusion was wrong, it cannot be said to be arbitrary or capricious, and is therefore binding upon this Court.

We have fully considered all of the other arguments and contentions of the parties and conclude that they are, likewise, without merit. The Commission's Order is based on adequate findings supported by substantial evidence in the record before it.

The petitions are dismissed and the temporary restraining order is discharged. A stay of 30 days is granted.