The **PITTSBURGH AND LAKE ERIE RAILROAD COMPANY**
and
**Pennsylvania New York Central Transportation Company, Plaintiffs,**
v.
**UNITED STATES of America**
and
**Interstate Commerce Commission, Defendants.**
**Civ. A. No. 68–361.**

United States District Court
W. D. Pennsylvania.
Nov. 25, 1968.

Robert W. Ginnane, Gen. Counsel, Fritz R. Kahn, Deputy Gen. Counsel, Interstate Commerce Commission Washington, D.C., for Interstate Commerce Comm.

Gustave Diamond, U. S. Atty., Pittsburgh, Pa., for the United States.

Gordon E. Neuenschwander, Pittsburgh, Pa., for Pittsburgh & Lake Erie R. Co.

Robert D. Brooks, Thompson W. Ryan, New York City, for Penn Central.

E. V. Buckley, Pittsburgh, Pa., for Western Maryland, C. & O., B. & O. and Maryland Port Authority.

Norman C. Melvin, Gen. Counsel, Western Maryland Railway Co., Baltimore, Md., for Western Maryland.

William L. Marbury, Baltimore, Md., for Maryland Port Authority.

Edward K. Wheeler, Washington, D. C., for C. & O. and B. & O.

John Guandolo, MacDonald & McInerney, Washington, D.C., for City of Hagerstown.

Harry Lentchner, Pittsburgh, Pa., for Minority Directors of Reading Co.

Before STALEY, Circuit Judge, and WILLSON and DUMBAULD, District Judges.

## OPINION

DUMBAULD, District Judge.

This action was instituted by the Pittsburgh and Lake Erie Railroad Company ("P. & L. E.") and Pennsylvania New York Central ("Penn Central") to set aside a report dated February 21, 1967, and an order issued pursuant thereto dated February 23, 1968, by the Interstate Commerce Commission authorizing the Chesapeake & Ohio Railway Company ("C. & O.") and the Baltimore & Ohio Railroad Company ("B. & O.") to acquire control of Western Maryland Railroad Company ("W. M.") through ownership of capital stock. The City of Hagerstown intervened as a party-plaintiff, and C. & O., B. & O., W. M., and the Maryland Port Authority have intervened as parties-defendant. A motion for issuance of a temporary restraining order pending final hearing and determination of the action was denied by order of Judge Willson on March 26, 1968, and on March 29, 1968, C. & O.-B. & O. acquired control of Western Maryland.

*Proceedings before the Commission*

C. & O.-B. & O. gained control of Western Maryland in the following manner. In 1927, B. & O. acquired about 43.9% of W. M.'s stock. Soon thereafter, the Commission brought a Clayton Act proceeding against B. & O., and ordered divestiture because it found that the effect of acquisition might be to substantially lessen competition. Interstate Commerce Commission v. Baltimore & O. R. Co., 160 I.C.C. 785 (1930). B. & O. forestalled divestiture by obtaining the Commission's acceptance of a proposal that the stock be trusteed with The Chase National Bank of the City of New York, now The Chase Manhattan Bank. Under the trust agreement, the trustee was required to exercise his best judgment in selecting suitable directors and in voting and acting upon other matters. The Commission also required that during the continuance of the agreement the stock should be voted so as to preserve the entire independence of directors and management between the B. & O. and Western Maryland, and to prevent the election of common officers or directors by the companies without the Commission's consent. The Commission also specified that the trust could not be dissolved except by its order or that of a court of competent jurisdiction.

Following the establishment of the trust, C. & O. (which now controls B. & O.) acquired some 20.83% of Western Maryland stock. On June 24, 1964, C. &

O. and B. & O. filed a joint application with the Commission seeking authority under Section 5(2) of the Interstate Commerce Act [49 U.S.C. § 5 (2)] to acquire control of Western Maryland through dissolution of the stock voting trust. (Such dissolution would effectively give C. & O.-B. & O. joint voting control of 64.73% of Western Maryland's outstanding stock.) Permission to dissolve the trust was given by the Commission, and this action followed.

The crux of P. & L. E.'s complaint is that although it requested specific traffic conditions to be imposed in the event that the Commission granted the C. & O.-B. & O. application to assume direct control of Western Maryland, the traffic conditions which were actually imposed were not protective enough to prevent diversion of traffic from the Pittsburgh Dispatch Route to the B. & O. Route. These two routes largely parallel each other between Baltimore, Maryland, and Youngstown, Ohio. The difference between them is that the B. & O. route (known as Central States Dispatch Route) is a direct single-line service which can carry traffic the entire distance without turning it over to any other road; whereas, the Pittsburgh Dispatch Route is a joint route over P. & L. E. and Western Maryland, extending between Youngstown and Baltimore, with interchange at Connellsville, Pennsylvania. Traffic moving on Pittsburgh Dispatch Route is turned over by one road to the other at Connellsville, Pennsylvania.

P. & L. E. professes to fear that since C. & O.-B. & O. now controls Western Maryland, C. & O.-B. & O. will divert traffic from the Pittsburgh Dispatch Route to its single line B. & O. route, and thereby severely diminish the amount of traffic that will be interchanged at Connellsville with the P. & L. E. This contention flies in the face of several provisions laid down by the Commission to prevent just such a practice. The Commission obligated the acquiring companies and Western Maryland to maintain and keep open all existing routes and channels of trade, to observe complete neutrality in handling traffic, and to continue present traffic and operating relationships with all connecting rail lines. By order of the Commission, C. & O., B. & O., and Western Maryland are further obligated to maintain schedules and rates as favorable as those over competitive routes in which they are presently participating. 328 I.C.C. at 706, 760.

The Commission required of C. & O., B. & O., and W. M., as a condition to the acquisition of control, that they continue the Pittsburgh Dispatch as a fast, competitive route, to maintain "at least the same standards of service as prevail" presently, and to continue to publish or participate in rates over the Pittsburgh Dispatch Route competitive with those applicable via other routes. The roads were also forbidden, without Commission approval, to slow down transit time over the route or to impede the route in any manner. 328 I.C.C. at 757, 759.[1]

Western Maryland was required by the Commission "to keep in existence a separate and independent solicitation force which shall be obliged actively to

---

1. These requirements were imposed by the Commission in a backhanded manner by continuing in force the terms of certain agreements between C. & O.-B. & O., Western Maryland, P. & L. E., and other carriers participating in the Pittsburgh Dispatch Route, the Alphabet Route, and other routes. Apparently P. & L. E., having refused to enter into direct continuing contractual relations with the other carriers, would be at best merely a sort of "third-party beneficiary" of those agreements, and would have only an administrative remedy by requesting the Commission to enforce the conditions. But such a remedy would in practice be the normal method of enforcement, and more effective than a suit for breach of contract. See 328 I.C.C. at 700–706, 739–40, 756–60. Western Maryland would have the same remedy to enforce against P. & L. E. the equivalent conditions imposed in the Penn-Central merger. See Pennsylvania Railroad Company—Merger—New York Central Railroad Company, 327 I.C.C. 475, 537, 563–64 (1966).

solicit traffic over all routes and channels of trade." And to see that its strictures were obeyed, the Commission retained jurisdiction over the parties and the transaction and gave all persons having interest in the subject matter the right to make application for such modifications of the order as the public interest may require. 328 I.C.C. at 706, 761.

The City of Hagerstown opposed the acquisition, but the Maryland Port Authority, designated by Governor J. Millard Tawes to represent the general interests of the State of Maryland (Tr. 165, 177) in pursuance of the provisions of 49 U.S.C. § 5(2) (b), supports the Commission's order.

### Contentions of the Parties

Having in mind the classical criteria limiting the scope of judicial review of Commission orders [I. C. C. v. U. P. R. R. Co., 222 U.S. 541, 547, 32 S.Ct. 108, 56 L.Ed. 308 (1912); Rochester Tel. Corp. v. United States, 307 U.S. 125, 138–140, 59 S.Ct. 754, 83 L.Ed. 1147 (1939); Penn-Central Merger, 389 U.S. 486, 499, 88 S.Ct. 602, 19 L.Ed.2d 723 (1968)] in substance to determination whether there is error of law or lack of substantial evidence, the most superficially plausible contention here advanced against the Commission's order (by the City of Hagerstown) is the argument that the Appalachian Act (40 U.S.C. App. A § 2 et seq.) and other legislation for the benefit of distressed areas, being later in date than the pertinent parts of the Interstate Commerce Act, have amended the criteria of public interest contained in Section 5(2) (b) of that Act.

However, the attractiveness of this argument is dispelled by examination of the actual text of the subsequent legislation relied on. It becomes clear that such legislation gives effect to the policies it proclaims by means of the specific programs therein established, and not otherwise. The criteria for carrier mergers under Section 5(2) (b) remain unchanged. The most that can be said is that the economic welfare of distressed areas, like the antitrust laws, is merely one aspect or facet of the considerations to be taken into account by the Commission in evaluating the public interest.

Moreover, this argument was even more vigorously urged by the City of Scranton in the Penn-Central merger than by Hagerstown in the case at bar, but neither the opinion of Mr. Justice Clark for the Court nor the concurring opinions of Brennan and Douglas, JJ., nor the dissenting opinion of Fortas, J., considered the point as being worthy of comment. B. & O. R.R. Co. v. United States, 386 U.S. 372, 87 S.Ct. 1100, 18 L.Ed.2d 159 (1967).

The Commission properly concluded (328 I.C.C. at 709–10) that no new statutory criteria have replaced the familiar provisions of Section 5.

The applicable standards governing mergers are aptly summarized in the Commission's report (328 I.C.C. at 686–88). Besides the formula of "public interest" embodied in Section 5(2) (b), which includes the Congressionally-declared "national transportation policy" and the antitrust laws, the Commission must consider also certain specific considerations set forth in Sections 5(2) (c) and 5(2) (e).[2] No contention has

2. Section 5(2) (c) reads:
 In passing upon any proposed transaction under the provisions of this paragraph (2), the Commission shall give weight to the following considerations, among others: (1) The effect of the proposed transaction upon adequate transportation service to the public; (2) the effect upon the public interest of the inclusion, or failure to include, other railroads in the territory involved

in the proposed transaction; (3) the total fixed charges resulting from the proposed transaction; and (4) the interest of the carrier employees affected.
 Section 5(2) (e) reads:
 No transaction which contemplates a guaranty or assumption of payment of dividends or of fixed charges, shall be approved by the Commission under this paragraph except upon a specific find-

been made in the case at bar that these last-mentioned provisions of Section 5 have been contravened by the Commission in its order. Section 5(2) (e) is clearly inapplicable, and the Commission so found (328 I.C.C. at 687), while the applicable parts of Section 5(2) (c) were adequately dealt with by the Commission in connection with pertinent portions of its report.

Another contention advanced by Hagerstown is that the Commission cannot authorize control of Western Maryland by C. & O.-B. & O. because such control was obtained illegally in violation of Section 5(4) of the Interstate Commerce Act. That provision reads:

It shall be unlawful for any person, except as provided in paragraph (2), to enter into any transaction within the scope of subparagraph (a) thereof, or to accomplish or effecutate, or to participate in accomplishing or effectuating, the control or management in a common interest of any two or more carriers, however such result is attained, whether directly or indirectly, by use of common directors, officers, or stockholders, a holding or investment company or companies, a voting trust or trusts, or in any other manner whatsoever. It shall be unlawful to continue to maintain control or management accomplished or effectuated after the enactment of this amendatory paragraph and in violation of its provisions. As used in this paragraph and paragraph (5), the words "control or management" shall be construed to include the power to exercise control or management.

It is of course true that there can be situations where control of a carrier has been obtained under circumstances evincing such a deliberate or flagrant violation of law that the Commission would be warranted in concluding that the continuance of such control by the party exhibiting such disregard for legality would not be consistent with the public interest.[3] No such conclusion, however, has here been made by the Commission, nor would such a conclusion be warranted by the facts.

Moreover, the same result is corroborated by another course of reasoning. Historically, it must be remembered that Section 5 of the Interstate Commerce Act as originally enacted in 1887 was a precursor of the Sherman Act enacted three years later. Both statutes were inspired by the same policy of protecting competition and preventing monopoly. Erie-Lackawanna R. R. Co. v. United States, 279 F.Supp. 316, 327–328 (S. D.N.Y.1967). Later amendments to Section 5 relaxed the requirements of that policy in order to permit transactions deemed beneficial to the public in other respects outweighing the anticompetitive consequences. The present form of Section 5(11) of the Interstate Commerce Act confers upon participants in a transaction approved by the Commission as being consistent with the public interest plenary dispensation from the restraints of the antitrust and other laws.

Section 5(11) provides:

The authority conferred by this section shall be exclusive and plenary, and any carrier or corporation partici-

---

ing by the Commission that such guaranty or assumption is not inconsistent with the public interest. No transaction shall be approved under this paragraph which will result in an increase of total fixed charges, except upon a specific finding by the Commission that such increase would not be contrary to public interest.

3. Gilbertville Trucking Co. v. United States, 371 U.S. 115, 125–129, 83 S.Ct.

217, 9 L.Ed.2d 177 (1962). Such a situation would resemble that where safety violations by a motor carrier are taken into consideration in passing on an application for additional operating authority, or a radio station's programming in connection with its application for renewal of its license to broadcast. Office of Communication of the United Church of Christ v. F.C.C., 123 U.S.App. D.C. 328, 359 F.2d 994, 1000–1005 (1966).

pating in or resulting from any transaction approved by the Commission thereunder, shall have full power * * * to carry such transaction into effect and to own and operate any properties and exercise any control or franchises acquired through said transaction without invoking any approval under State authority; and any carriers or other corporations, and their officers and employees and any other persons, participating in a transaction approved or authorized under the provisions of this section shall be and they are hereby relieved from the operation of the antitrust laws *and of all other restraints, limitations, and prohibitions of law, Federal, State, or municipal,* insofar as may be necessary to enable them to carry into effect the transactions so approved or provided for in accordance with the terms and conditions, if any, imposed by the Commission, and to hold, maintain, and operate any properties and exercise any control or franchise acquired through such transaction. * * * (Italics supplied).

If, therefore, the Commission can relieve parties to a Section 5 transaction from the restraints of the Antitrust Laws, why should any different rule apply with respect to the effect of an approved transaction when the illegal control results by reason of the terms of Section 5(4) instead of by reason of the terms of the Sherman Act? Particularly when it is remembered that the original version of Section 5 was a law to protect competition and prevent monopoly, and that to the extent that a different policy has not been embodied in subsequent amendments to Section 5, the same policy is still inherent in those portions of Section 5 which do not comprise part of the dispensation procedure.

■ If the Commission's approval under Sections 5(2) (a) and 5(2) (b) suffices to dispense with the Antitrust Laws *in toto*, then *a fortiori* it surely suffices to relieve from such residual vestiges of antitrust policy as remain inherent in the undiluted portions of Section 5, and in particular in the provisions of the present Section 5(4).

■ Moreover, it is clear that to obtain the benefit of the immunity procedure under Section 5 in its present form, the provisions of the immunizing statute must be strictly complied with. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 225–227, 60 S.Ct. 811, 84 L.Ed. 1129 (1940). Nothing else will suffice. But if there is compliance, the dispensation is plenary. The parties are then "relieved from the operation of * * * all * * * restraints, limitations, and prohibitions of law, Federal, State, or municipal", including, indubitably, the provisions of Section 5(4).

■■ The Commission, in determining where the public interest lies, must, if occasion requires, weigh the importance of respect for and observance of law, in comparison with the improvements in transportation service and other benefits to be derived from the challenged control. Illinois Central R. R. Co. v. United States, 263 F.Supp. 421, 425–430 (N.D.Ill.E.D.1966), aff'd. per curiam 385 U.S. 457, 87 S.Ct. 612, 17 L. Ed.2d 509 (1967). The Commission is not obliged to disapprove as a matter of law every transaction where there has been some degree of prior unlawful control.

■ In any event, in the absence of collusion between the C. & O. or B. & O. and the trustee of the B. & O. stock held in trust (which is nowhere alleged), the Commission was clearly correct in concluding that the B. & O. stock was "sterilized" by the terms of the trust agreement, and that in fact there has been no violation by C. & O. or B. & O. of the provisions of Section 5(4).

The Commission in its report stated that Chase Manhattan Bank, as trustee, voted 43.9% of W. M.'s stock, that 35.-27% of the stock was in the hands of others unaffiliated with B. & O. or C. & O. and that there was no showing that C. & O. either acquired control of West-

ern Maryland or power to exercise such control. 328 I.C.C. at 692.

Whether one company controls another is "an issue of fact to be determined by the special circumstances of each case." Rochester Telephone Corp. v. United States, 307 U.S. 125, 145, 59 S.Ct. 754, 764, 83 L.Ed. 1147 (1939). Where the factual determination has been made by an administrative agency, the determination must stand so "long as there is warrant in the record for the judgment of the expert body". Ibid., 145–146, 59 S.Ct. 764. And the fact that reasonable men might differ over the conclusion to be drawn from the evidence provides no basis for reversal. Illinois Central R. R. Co. v. N. & W. Ry. Co., 385 U.S. 57, 69, 87 S.Ct. 255, 17 L.Ed.2d 162 (1966); Consolo v. Federal Maritime Commission, 383 U.S. 607, 620, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966). The Commission, under the Interstate Commerce Act, must determine from the facts whether "control" exists, subject to normal standards of review. Gilbertville Trucking Co., v. United States, 371 U.S. 115, 125, 83 S.Ct. 217, 9 L.Ed.2d 177 (1962).

Chase Manhattan, as voting trustee of 43.9% of the stock, has held and exercised control for many years prior to the dissolution of the trust. That approximately this amount of W. M.'s stock is a controlling proportion was explicitly so determined by the Commission when it considered B. & O.'s original purchase. I. C. C. v. B. & O., 160 I.C.C. 785, 792 (1930). The power to elect the board of directors of a company is undoubtedly the power to control the company. See Alleghany Corp. v. Breswick & Co., 353 U.S. 151, 163, 77 S.Ct. 763, 1 L.Ed.2d 726 (1957). And the voting trust agreement compels Chase Manhattan to maintain "the entire independence of directors and management" between B. & O. and W. M. See I. C. C. v. B. & O., 183 I.C.C. 165, 168 (1932).

It seems clear that the trustee had control up to the date of the dissolution of the trust pursuant to the Commission's order here under review, and hence that there was no violation of Section 5(4).

Turning now to the contentions of the carrier plaintiff P. & L. E. and its owner Penn-Central, some of which are also advanced by Hagerstown, we note first a number of procedural objections, none of which possess merit. Thus it is said that the Commission did not make findings and avouch reasons therefor as required by the Administrative Procedure Act [5 U.S.C. § 557(c)]. What plaintiff in fact means is that the Commission did not make the findings which plaintiff would have wished and which would have supported the results desired by plaintiff. The Commission did make clear and adequate findings which support the results which it actually reached. It is not required to do more. In substance plaintiff is merely questioning the wisdom of the Commission's decision, and this is not a matter for determination by this Court. As well stated by Mr. Justice Frankfurter: "It is the Court's duty to sustain the Commission's findings if, as here, there is no real difficulty in determining what was decided and on what grounds." I. C. C. v. J-T Transport Co., Inc., 368 U.S. 81, 130, 82 S.Ct. 216, 235, 7 L.Ed.2d 147 (1961).

Plaintiff also contends that the record is stale. It was closed on January 28, 1965, and the Commission's report was served on March 6, 1967. Here again plaintiff is invoking a concept which is really inapplicable but is being used as a legal mould into which to pour plaintiff's disagreement with the wisdom of the results reached by the Commission. We are not here dealing with a genuine stale record, as in A. T. & S. F. Ry. Co. v. United States, 284 U.S. 248, 260, 52 S.Ct. 146, 76 L.Ed. 273 (1932), where during the period between September 1928 and February 1931 a memorable depression had occurred and a substantial change in economic conditions had taken place. "The Court, however, promptly restricted that decision to its special facts, * * * and it stands virtually alone." I. C. C. v. Jersey City,

322 U.S. 503, 515, 64 S.Ct. 1129, 1135, 88 L.Ed. 1420 (1944). See also Lang Transp. Corp. v. United States, 75 F. Supp. 915, 929 (S.D.Calif. Central Div. 1948); and I.C.R.R. Co. v. United States, 263 F.Supp. 421, 431–434 (N.D. Ill.E.D.1966). In the last-named case Judge Decker pointed out that: "Records in long and complex cases are inevitably outdated on the date of decision and the Commission has broad discretion to refuse to permit further delay to obtain evidence of changed conditions." 263 F.Supp. at 434.

Plaintiff is really not complaining of undue delay but simply pointing out that since deciding the case at bar the Commission has decided other Section 5 cases and in them has imposed conditions somewhat different from those imposed in the case at bar. These are denominated "innovative" by plaintiff. This is simply saying that in these later cases, in the familiar phrase of the automobile manufacturer's television commercial, "the Commission has a better idea".

But one of the vaunted advantages of administrative procedure is that the conditions, requirements, and practices prescribed by an agency in a particular case may be tailored to fit the specific facts and circumstances of that case. Like equity, administrative action is expected to afford a remedy for situations "wherein the law by reason of its generality is deficient." Precedent is less binding and authoritative, imagination and flexibility more prized.

The Interstate Commerce Commission is not forbidden to adopt different, or even better, ideas in different proceedings. Consistency in Commission decisions is not required. Virginia Stage Lines v. United States, 48 F.Supp. 79, 82 (W.D.Va.1942); Lang Transp. Corp. v. United States, 75 F. Supp. 915, 925 (S.D.Calif. Central Div. 1948). Many "innovative" features may well be peculiar to the facts of the particular case in which they were evolved; and even if they might have been utilized in earlier cases, if anyone had then thought of them, there is no obligation upon the Commission to reopen earlier cases in order to improve its previous work. It would be as futile to expect Shakespeare to rewrite his earlier plays, or Rembrandt or Botticelli to retouch an earlier canvas, in order to insert refinements or novel techniques acquired in the course of experience. As well said by counsel for C. & O.-B. & O. (Brief, p. 32), "The Commission is scarcely required to stand still in its administration of the Interstate Commerce Act. Its power to innovate does not render illegal its prior actions."

Plaintiff also argues that it is premature to allocate Western Maryland to the C. & O.-B. & O. system before it is determined whether there are to be three rail systems in the East or two systems. A pending proceeding involving merger of C. & O. and Norfolk & Western would seem to be the appropriate forum for airing any problems arising out of the question as to how many systems are desirable. It is to be noted also that the Commission has retained jurisdiction in the Western Mayland case so that further relief is available there if it should become appropriate.

In substance what all these procedural arguments advanced by plaintiff boil down to is the proposition that the restructuring of the American railroad system by Commission-approved mergers under Section 5 ought to be accomplished *uno ictu* in one proceeding, in accordance with a master plan, where all interrelationships could be considered and determined simultaneously.

Theoretically such a proposition might be desirable, but it has been refuted by history in the field of railroad unifications. See B. & O. R.R. Co. v. United States, 386 U.S. 372, 386–387, 87 S.Ct. 1100, 18 L.Ed.2d 159 (1967); Penn-Central Merger, 389 U.S. 486, 492, 88 S.Ct. 602, 19 L.Ed.2d 723 (1968). Whatever view one may hold as to the desirability of simultaneous, comparative consideration of conflicting or mutually exclusive applications [See Ashbacker Radio Corp. v. F.C.C., 326 U.S. 327, 333, 66 S.Ct. 148, 90 L.Ed. 108 (1945)], it seems

plain that the Supreme Court has rejected that doctrine in the field of railroad mergers. This is clearly shown by the *Penn-Central* case. See 386 U.S. at 386–387, 87 S.Ct. 1100. The Department of Justice did advocate consolidation of certain major proceedings. 386 U.S. at 424, 432, 87 S.Ct. 1100. Justice Douglas also advocated a "master plan" in his concurring opinion. 386 U.S. at 458, 87 S.Ct. 1100. Justice Brennan also stressed the disadvantages of "case-by-case adjudication" and the usefulness of "consolidated consideration" (386 U.S. at 431, 87 S.Ct. 1100). But the Court did not overthrow the Commission's practice of handling mergers on a case-by-case basis, or require any compulsory consolidation of proceedings.

■ What the scope and issues of a particular proceeding should be is a matter which ordinarily should be left to the discretion of the Commission, for it can best exercise calendar control, fix convenient hearing dates, and channel the work flow. Large scale consolidation might well result in burdensome administrative inconvenience in consulting the schedules of an inordinately numerous assemblage of counsel, and produce a mammoth, unmanageable record. Procedural details are best left to the experienced judgment of the Commission.

It is next contended that the Commission did not adequately appraise the competitive effects of the transaction, so as to accord proper weight to the antitrust laws as an ingredient of the "public interest" formula. In this connection it is significant that the Antitrust Division, in a memorandum filed in the case at bar, indicates its approval of the Commission's order here under review. In other cases, the Department of Justice has often offered vigorous opposition to rail unification proposals (e. g. Seaboard Air Line R.R. Co. v. United States, 382 U.S. 154, 155, 86 S.Ct. 277, 15 L.Ed.2d 223 (1965), and certain aspects of the Penn-Central merger).

Under the antitrust laws *simpliciter*, of course, common control of two parallel railroad lines would present a classi-cal case of violation of the Sherman Act by elimination of competition. Northern Securities Co. v. United States, 193 U.S. 197, 327, 24 S.Ct. 436, 48 L.Ed. 679 (1904). But on the other hand such a unification of parallel lines offers the most fruitful field for effecting operating economies and elimination of duplications of service and facilities. These factors are the most commonly offered type of transportation considerations which are accepted by the Commission as justification for finding that the public interest permits a particular transaction in spite of its repugnance to antitrust policies. It must be conceded that such economies are often illusory (386 U.S. at 446, 87 S.Ct. 1100) and that they were not the major goal of the statutes governing railroad mergers (386 U.S. at 426, 87 S.Ct. 1100), but they undoubtedly constitute *one* of the many "relevant factors" which the Commission must consider in appraising the merits of a proposed transaction. (386 U.S. at 402–403, 87 S.Ct. 1100). Similarly, antitrust policies constitute *one* of those factors to be weighed. (389 U.S. at 500, 88 S.Ct. 602).

The principles governing the Commission's task in according due weight to competitive factors in evaluating the effect of a proposed merger on the public interest are clearly delineated in a number of leading cases: McLean Trucking Co. v. United States, 321 U.S. 67, 83–87, 64 S.Ct. 370, 88 L.Ed. 544 (1944); Minneapolis & St. Louis Ry. Co. v. United States, 361 U.S. 173, 186–188, 80 S.Ct. 229, 4 L.Ed.2d 223 (1959); Seaboard Air Line R.R. Co. v. United States, 382 U.S. 154, 156, 86 S.Ct. 277, 15 L.Ed.2d 223 (1965).

In the last-named case the Supreme Court quoted with approval from the Minneapolis decision (361 U.S. at 186, 80 S.Ct. at 237) the following summary of the pertinent criteria:

Although § 5 (11) does not authorize the Commission to "ignore" the antitrust laws, McLean Trucking Co. v. United States, 321 U.S. 67, 80, 64 S. Ct. 370, 88 L.Ed. 544, there can be

"little doubt that the Commission is not to measure proposals for [acquisitions] by the standards of the antitrust laws." 321 U.S., at 85–86, 64 S. Ct. 370. The problem is one of accommodation of § 5 (2) and the antitrust legislation. The Commission remains obligated to "estimate the scope and appraise the effects of the curtailment of competition which will result from the proposed [acquisition] and consider them along with the advantages of improved service [and other matters in the public interest] to determine whether the [acquisition] will assist in effectuating the over-all transportation policy."

 In this connection it must be remembered that in determining what constitutes the "public interest" under Section 5, just as in determining what transportation service is required by "public convenience and necessity" under Section 207 of the Act [49 U.S.C. § 307], the Commission is entrusted with the function not merely of determining the existence or non-existence of certain facts, but also of exercising an expert judgment with respect to transportation matters. Lang Transportation Corp. v. United States, 75 F.Supp. 915, 921 (S.D.Calif. Central Div.1948); United States v. Detroit & Cleveland Navigation Co., 326 U.S. 236, 241, 66 S. Ct. 75, 90 L.Ed. 38 (1945); Illinois Central R.R. Co. v. N. & W. Ry. Co., 385 U. S. 57, 69, 87 S.Ct. 255, 17 L.Ed.2d 162 (1966). The Commission's discretion must be exercised upon the facts found and conclusions reached in the particular transaction under review. There is no presumption either in favor of or against rail mergers as an *a priori* proposition. B. & O. R.R. Co. v. United States, 386 U.S. at 372, 402, 87 S.Ct. 1100, 18 L.Ed.2d 159 (1967).

 Accordingly, reduction of competition is not, as a matter of law, an absolute obstacle to a rail merger. *Penn-Central Merger Cases*, 389 U.S. 486, 499–500, 88 S.Ct. 602, 19 L.Ed.2d 723 (1968). We believe that in the case

at bar the Commission struck the necessary accommodation between the antitrust laws and the mandates of the Interstate Commerce Act. Evidence was adduced which indicated that if W. M. was not allowed to achieve significant economies of operation it would increasingly find itself losing out to other forms of competition such as trucking, and pipeline transportation. It was believed that competition among railroads was no longer as significant as competition between the roads and other forms of transportation. It is to be noted that Hagerstown, despite this transaction, will continue to have service from three other major railroads.

In accordance with the above-cited principles, the Commission's report (especially 328 I.C.C. at 693–94, 699–702) did not "ignore" antitrust policies but made appropriate "accommodation" between them and other factors affecting the public interest.

In particular, the Commission held (328 I.C.C. at 702) that:

By specific agreements, applicants are effectively precluded from diverting to B & O any significant amount of traffic now handled competitively over Western Maryland lines. Rail competition now provided by B & O and Western Maryland in most of the areas served by Western Maryland will be effectively assured only if approval of the application is made subject to conditions reflecting the continuing obligations of the aforementioned agreement. Public interest demands the continued movement of Western Maryland traffic over the routes here in question. With the assurance of continued rail competition in the area, the dangers of a rail transportation monopoly contrary to the policy of the antitrust laws are greatly attenuated. Our approval of the application herein will be made subject to such conditions.

In other words, by reason of the protective conditions imposed by the Commission (which will be discussed more

fully hereafter), there will still continue to exist substantial competition between the B. & O. single-line route and the Western Maryland's joint routes, notably the Pittsburgh Dispatch Route.

The Commission also emphasized the current importance of "intermodal" and "market" competition as significant factors (328 I.C.C. at 694). This same line of thought prevailed in the *Penn-Central* case, (327 I.C.C. at 516).

The full significance of these findings with respect to competitive conditions may not be evident without reflection and analysis. Armed with the dispensing power to relieve from the prohibition of the antitrust laws, the Commission is not obliged to encourage competition *per se* and in all circumstances, but only when competition is beneficial to the public and the benefits thereof are not outweighed by other factors expected to produce greater benefits to the public. Ordinarily the benefits resulting from competition in any industry are improved service and the reduction of rates to the competitive level. Economists have often demonstrated mathematically that monopoly results in higher prices and lower production. Competition results in lower prices and a greater output of commodities or services. Competition thus imposes a ceiling upon prices or rates.

The effect of competition between rail carriers (what the Commission called "intramodal" competition) is therefore ordinarily to bring about rate reductions to the competitive (as distinguished from the monopolistic) level. These benefits the Commission sought to preserve by preventing elimination of competition between B. & O. and Western Maryland when it filed in 1928 the complaint which resulted in the trust agreement "sterilizing" the Western Maryland stock owned by B. & O. (328 I.C.C. at 688–89).

During the ensuing decades, the Commission now finds, substantial changes in economic conditions have taken place (328 I.C.C. at 693–95). An important factor is what the Commission called "intermodal" competition. In the case at bar this means truck competition. The ceiling upon transportation rates charged by B. & O. or Western Maryland, the Commission is saying, is imposed not by the rates of the competing rail carrier, but by those of the competitive motor carriers. In other words, even if one railroad were given a monopoly of rail service in the territory involved, it could not raise its rates to a monopolistic level, but would be limited by the ceiling set by motor carrier competition.

Similarly, the Commission reasons, market competition imposes a ceiling upon what a rail monopolist could charge. That is to say, an electric power company would not buy coal and pay railroad rates for its transportation at a monopolistic level if other fuels were available at less cost.

If such rate ceilings for rail rates are in fact imposed by intermodal or market competition, it is clear that the necessity for continuance of intramodal rail competition as a means of driving rates down to the competitive level is significantly diminished. Intramodal competition would no longer be the controlling factor in imposing the ceiling on rail rates. Hence, since the public would be able to enjoy the benefit of rail rates at a competitive level without the continuance of intramodal competition, the Commission, guided by the "public interest" criterion, would be free to authorize the elimination or diminution of such competition between the B. & O. and Western Maryland lines without fear of the evil consequences which it sought to avert forty years ago when intermodal and market competition were not significant factors in depressing rail rates from a monopolistic to a competitive level.

At first glance one might suspect, that, as Hagerstown argues (Brief, p. 25), the Commission has overemphasized the effect of truck competition. One would suppose that for a heavy-loading, low-value commodity such as coal the railroads would have the inherent advan-

tage except for short hauls to areas near a mine (see 386 U.S. at 448–449, 87 S. Ct. 1100). However, this reflection amounts to nothing more than to question the wisdom of the Commission's conclusion upon weighing the evidence. The question is one of fact, and to be determined by the Commission. Clearly there was evidence to support the conclusion which the Commission reached. Clarence R. Zarfoss, then Vice President-Sales of the Western Maryland, now Vice President-Merchandise Freight Group of the combined C. & O.-B. & O., testified that for ten years coal has been moving to Hagerstown by truck from the Clearfield district of Pennsylvania; and that this was "one of the reasons why we are here actually, in this control case: Far and away the largest customer we once had at Hagerstown, which is the heart of the Western Maryland system, was Potomac Edison and there isn't a single home in Hagerstown, there isn't a lathe turning from public power that is supplied by railroad transported coal. It all moves in by truck." (Tr. 449–50).[4]

Another witness, J. R. Maust, who stated that his company is one of the five largest bituminous coal producers in the eastern part of the United States, testified that his company meets with the competition of residual oil as a factor in supplying the power needs of steel companies and public utilities. A trend towards an increasing share of the market on the part of petroleum products and natural gas as against coal was demonstrated. Likewise there is growing competition from atomic energy and water power, as well as mine-mouth facilities for generation of electric power, and pipe lines to carry coal in the form of slurry. (Tr. 1169–71. See also Ex. 46, offered by witness Zarfoss).

Finally, and this is the heart of plaintiff's case, plaintiff contends that the Commission failed to impose "just and reasonable" conditions to its approval of the proposed transaction, as contemplated by Section 5(2) (b). See 386 U.S. at 387, 87 S.Ct. 1100.

Plaintiff complains that the conditions imposed by the Commission were not as stringent as those imposed in the Penn-Central Merger. But it must be remembered that the conditions in that case were designed to ensure that the smaller and financially weak railroads there involved were not trampled upon by the monopolistic Penn-Central complex. The fact alone that P. & L. E. did not ask for such conditions in its hearing before the Commission might prove determinative, but of even greater significance is the degree of discretion that courts allow the Commission in framing findings and conditions concerning traffic diversion. As stated by Judge Friendly in the Penn-Central merger case, Erie-Lackawanna R.R. Co. v. United States, 279 F.Supp. 316, 328 (S.D.N.Y.1967): "Forecasting the future ability and desire of railroads to effect diversion [of traffic] is peculiarly a matter for the expert judgment of the 'tribunal appointed by law and informed by experience.'" See also Minneapolis & St. Louis Ry. Co. v. United States, 165 F.Supp. 893, 900 (D.Minn.1958), aff'd, 361 U.S. 173, 80 S.Ct. 229, 4 L.Ed.2d 223; Florida East Coast Ry. Co. v. United States, 259 F.Supp. 993, 1016 (M.D.Fla., Jacksonville Div.1966), aff'd per curiam 386 U.S. 544, 87 S.Ct. 1299, 18 L.Ed.2d 285.

Furthermore, the Commission is not required to protect P. & L. E. from *all* diversion in the course of approving the consolidation.[5] Oscar Gruss & Son v. United States, 261 F.Supp. 386,

---

4. References to the certified transcript of the proceedings before the Commission, filed as part of the record in this Court, will be indicated by the abbreviation "Tr." The Court has reviewed the entire record before the Commission, and finds that all of the recitals in the Commission's report are supported by substantial evidence.

5. Arthur E. Baylis, vice-president of plaintiff, conceded on cross-examination that not all diversion of traffic is contrary to the public interest. (Tr. 958).

390 (S.D.N.Y.1966), vacated on other grounds, 386 U.S. 776, 87 S.Ct. 1478, 18 L.Ed.2d 520; Kansas City Southern Ry. v. United States, 288 F.Supp. 742, W.D. Mo., decided July 29, 1968. The Commission may properly approve a transaction when it will not have the effect of hindering or impairing the performance by some other railroad of its common carrier obligations. Carriers need not be protected against the ordinary risks of competitive railroading. See Missouri Pac. R. Co.-Control-Chicago and E. I. Co., 327 I.C.C. 279, 294 (1965), sustained *sub nom.* Illinois Central R. R. Co. v. United States, 263 F.Supp. 421, 435 (N.D.Ill.E.D.1966), aff'd *per curiam*, 385 U.S. 457, 87 S.Ct. 612, 17 L.Ed.2d 509 (1967); Erie R. R. Co. Merger, 312 I.C.C. 185, 191, 247 (1960), sustained *sub nom.* Brotherhood of Maintenance of Way Employees v. United States, 189 F. Supp. 942 (E.D.Mich.), aff'd *per curiam*, 366 U.S. 169, 81 S.Ct. 913, 6 L.Ed. 2d 206 (1961).

▆ Strictly speaking, in view of the deference to be accorded to administrative expertise, we think that the judicial task is limited to determining whether the conditions in fact imposed by the Commission could properly be found by it, upon the basis of applicable law and supporting evidence, to be just and reasonable.

▆ We do not think that we are warranted in speculating whether other conditions (which plaintiff now demands, but did not request of the Commission, because they were "innovations" evolved in the course of subsequent Commission proceedings) would be more just and more reasonable than those which the Commission in fact imposed.

Theoretically, of course, the reasonableness of one condition might depend upon its effectiveness when compared with available alternatives, just as the use of a particular safety device might constitute due care under the circumstances (or negligence) in the light of the technology commonly practiced in the industry.

What conditions did the Commission impose to effectuate its intention to maintain rail competition over Western Maryland routes?

Seven conditions (set forth as Appendix G of the report, 328 I.C.C. at 760–61) were imposed by the Commission. These are standard conditions, known as "D. T. and I. Conditions", from the name of the carrier involved in the proceeding in which they were first formulated, Detroit, Toledo & Ironton R. R. Co.-Control, 275 I.C.C. 455, 492 (1950). They are fully set forth in parallel columns with the twelve revised Penn-Central merger conditions at pp. 53–59 of plaintiff's brief.[6]

As to Condition No. 1, the principal difference is that the Penn-Central version adds the phrase "in full vigor as fast competitive service routes" to the wording used to describe the routes to be maintained. This variation in wording does not seem particularly important.

Plaintiff concedes that Conditions No. 2, 3, 4, 5 and 7 are substantially equivalent to the Penn-Central version.

Condition No. 6 is likewise the equivalent of the Penn-Central version, al-

6. It should be noted that the Commission also imposed as conditions the terms of certain traffic agreements designed to maintain the attractiveness of the Pittsburgh Dispatch Route to shippers. See Appendix E and Appendix F to the Commission's report, 328 I.C.C. at 756–60. See note 1, supra. Moreover, the standard "D. T. & I." conditions were also adopted in the Penn Central merger as Appendix I to the Commission's report. See 327 I.C.C. at 564–65. Appendix H in that case (327 I.C.C. at 563–64) continued the terms of an agreement between P. & L. E. and Western Maryland to preserve and improve the Pittsburgh Dispatch Route "as a fast, competitive service route", eliminating the provision in said agreement that it shall expire upon C. & O.-B. & O. acquisition of control of Western Maryland. What plaintiff discussed in its brief as Penn Central conditions are those in revised Appendix I, adopted March 1, 1968, in connection with inclusion of the New Haven in Penn Central, 331 I.C.C. 754.

though plaintiff fallaciously argues that it is intended to protect the merging lines rather than plaintiff.

Paragraphs 6, 7, 10, 11, and 12 of the Penn-Central conditions seem to relate to details involved in that proceeding, and are hardly suitable for general use in other cases.

It thus appears that the conditions actually imposed by the Commission cannot be said to be unjust or unreasonable.

But further turning our attention to the conditions not imposed by the Commission but desired by plaintiff ("the road not taken", as the poet Robert Frost might have said), we find no error in the Commission's action.

The conditions requested by plaintiff are ten in number. They are set forth at pp. 18–20 of plaintiff's brief, quoted from Exhibit 77, pp. 1–5. Of these Nos. 1–3 are substantially identical with the Commission's conditions. No. 7 is equivalent to the Commission's No. 4, and No. 9 to its No. 5. Nos. 4, 5, 6 and 8 relate to the Demmler interchange, and No. 10 would require maintenance of existing operating schedules for freight trains.[7]

Maintenance of schedules is an operating problem with multitudinous facets, and the Commission, we believe, wisely avoided injecting such complexities into a Section 5 proceeding. It would seem that under Section 1 of the Act the Commission has sufficient control over car service and supply of trains to deal with any substantial violations of the conditions which the Commission imposed. In any event, the Commission reserved jurisdiction in the instant proceeding and could reopen the case if it should prove necessary to deal with such violations and the Commission's other regulatory powers should be found inadequate for that purpose.

The Commission's reasoning in Erie R. R. Merger, 312 I.C.C. 185, 191 (1960), quoted in Kansas City Southern Ry. Co. v. United States, 288 F.Supp. 742, W.D.Mo.W.D., decided July 29, 1968, is pertinent to this matter:

In connection with transactions such as this, it is not practicable, nor would it be in the public interest, to impose conditions calculated to freeze the flow of traffic into a preexisting pattern or to protect competing and connecting carriers against all unification and resulting improvements in service by the surviving corporation. Such action would prevent, to a substantial extent, the effectuation of service improvements to which the shipping public is entitled, and would unduly restrict the unified company in its solicitation and routing of traffic and the development of a strong competitive system.

Significant also in this connection is the fact that plaintiff was offered, but spurned, an opportunity to enter into an agreement to maintain the quality of service over the Pittsburgh Dispatch Route. See 328 I.C.C. at 704, 740, 757–60. In view of this refusal, it would seem that plaintiff has little genuine concern for service over the Pittsburgh Dispatch Route, and that the conditions with respect thereto which it requested were properly rejected by the Commission.

It will be remembered that during the pendency of the Penn-Central merger

---

7. Messrs. Beryl, Rafkind and Schoenfeld, as directors and minority stockholders of the Reading Company, filed a petition to intervene, asserting that they are parties in interest and that they seek the right to intervene in order to challenge that part of the Commission's order which does not make the inclusion of Reading and CNJ in the C. & O.-B. & O. system a prerequisite to approval of the control application. At the hearing Harry Lentchner, Esquire, appeared for the directors. He agreed with the response by defendants C. & O.-B. & O.—" * * * that intervention by the dissident directors is not a matter of statutory right but one addressed to the sound discretion of the court * * *." Mr. Lentchner requested time to file a brief. This was granted as was an extension of time, but no brief has been filed by counsel for the Reading directors. We grant their right to intervene. However, we find no merit to their contentions.

(see 328 I.C.C. 703–704), Western Maryland was concerned about the impact of that merger upon the Pittsburgh Dispatch Route. Accordingly, an agreement was entered into on March 20, 1963 between Western Maryland, P. & L. E. and Penn-Central designed "to provide firm assurance to Western Maryland· and to shippers who route their traffic via the lines of Western Maryland and Pittsburgh [& Lake Erie], that the movement of such traffic will not be adversely affected by any actions of [Penn-Central or P. & L. E.] in the event of the approval and consummation of the aforesaid merger".

The agreement then embodied the eight items which were incorporated as Appendix M of the examiner's report in the Penn-Central merger proceeding, and became Appendix H to the Commission's report. 327 I.C.C. at 563–64. (The Commission added a ninth paragraph dealing with its retention of jurisdiction for future modifications.)

The underlying agreement of March 20, 1963, contained six further paragraphs which the Commission's conditions did not incorporate. Paragraph 9 provided that the carriers would publicize the terms of the agreement to their respective traffic and operating personnel; paragraph 10 provided that the agreement was to be enforceable either by the I.C.C. (if the provision allegedly violated had been incorporated by the Commission as a condition in the merger case), or by a court of competent jurisdiction, or by arbitration as provided in paragraph 11. Paragraph 12 declared that the agreement was to constitute a contract binding the parties "whether or not imposed by the Interstate Commerce Commission as merger conditions." Paragraph 14 provided that the contract might be introduced as evidence in the merger case, and that its terms might be imposed by the Commission as conditions in the merger case without objection by the parties.

Paragraph 13 provided that:

This agreement shall be contingent upon and shall take effect on the same date as the consummation of Central into Pennsylvania. If these transactions are not consummated, then this agreement shall be void and of no effect. This agreement shall continue so long as control of Western Maryland is exercised by a trustee of its stock, and so long thereafter as such control is not exercised by a railroad company.

By its terms, therefore, this agreement for protection of the Pittsburgh Dispatch Route was to terminate if control of Western Maryland were to be acquired by another railroad. The Commission, in the Penn-Central Case 327 I.C.C. at 563–64) and in the Western Maryland control case eliminated paragraph 13, when holding in the latter proceeding that rail competition between B. & O. and Western Maryland, to the extent required in the public interest, would be "assured only if approval of the application is made subject to conditions reflecting the continuing obligations of the aforementioned agreement * * *. Our approval of the application herein will be made subject to such conditions." 328 I.C.C. at 702. Consequently, upon consummation of the control of Western Maryland, B. & O. became bound by substantially the same provisions of the 1963 agreement which had become binding upon Penn-Central and P. & L. E. by Appendix H in the Penn-Central proceeding. But since P. & L. E. resolutely refused to continue the terms of that agreement as a contract between the parties (cf. paragraph 12 of the 1963 agreement), as the Commission pointed out in the instant case (328 I.C.C. at 704), the mode of enforcement of these mutual obligations is by resort to the Commission. Direct court action or arbitration (cf. paragraph 10 of the 1963 agreement) is excluded. However, resort to the Commission would seem to be the normal and most adequate method of enforcement in any event (see notes 1 and 6, supra) and any legitimate interest of· P. & L. E. in the continued vitality of traffic over the Pittsburgh Dispatch Route has been af-

forded appropriate protection by the conditions which the Commission imposed in the case at bar.

Examination of the Demmler conditions proposed by P. & L. E. indicates that plaintiff is tendering a Trojan horse or a wolf in sheep's clothing when it offers those conditions professedly for the purpose of protecting the so-called Pittsburgh Dispatch Route over the Western Maryland line.

The heart of the Demmler conditions is No. 4 which would provide that:

In the event that the volume of traffic interchanged between the Pittsburgh and Lake Erie Railroad and the Western Maryland Railway at Dickerson Run Yard, Connellsville, Pa., should decline to a level below the average annual interchange during the period 1960–64, the Pittsburgh and Lake Erie Railroad may request and the Baltimore and Ohio Railroad shall grant the right to change the point of interchange for P & L E-W M traffic from Connellsville to Demmler, Pa.

Demmler is a point on the B. & O. Railroad which is not served by the Western Maryland Railroad at all. Demmler is 12 miles from Pittsburgh, whereas Connellsville is 58 miles from Pittsburgh. Plaintiff's proposed condition No. 4 would give to plaintiff (and its owner Penn-Central) the right to route traffic over the B. & O.'s direct route (called Central States Dispatch Route), thereby diverting such traffic from the Pittsburgh Dispatch Route which plaintiff professes to wish to protect. Plaintiff's proposed condition No. 5 would give plaintiff the right to be paid by the B. & O. for such diverted traffic the same revenue which plaintiff would receive if the traffic actually moved over the Pittsburgh Dispatch Route, i. e. moved 46 miles further over plaintiff's line. Plaintiff would thus be doing less work for the same pay. "Featherbedding" in the railroad industry is evidently not confined to the unions, but is practiced by management also when possible. The Commission

was clearly right in refusing to accept the proposed Demmler conditions as just and reasonable.

Those conditions would have given plaintiff the power to diminish traffic over the Pittsburgh Dispatch Route, which plaintiff professes to wish to protect. (It may be noted further that Penn-Central could also divert traffic from the Pittsburgh Dispatch Route to its own direct single-line route between Pittsburgh and Baltimore). 328 I.C.C. at 705, 739; Tr. 961–65, 980. As stated in a portion of the Hearing Examiner's report quoted by the Commission, "it was actually the P. & L. E., not Western Maryland, which was responsible for the last cutback in the quantity of service via the Pittsburgh Dispatch Route." 328 I.C.C. at 739; Tr. 299, 939. But the testimony of P. & L. E. vice president Baylis shows that the assumption underlying the Demmler conditions was the supposition that by reason of B. & O. machinations the Western Maryland "won't exist" and there will be "no Connellsville" and the Pittsburgh Dispatch Route traffic will "dry up". (Tr. 920–25, 937). It would have been utterly incongruous for the Commission to accept conditions based upon this hypothesis when the Commission was acting upon exactly the opposite hypothesis. The Commission's purpose was to impose conditions designed to assure the continued vigor of the Pittsburgh Dispatch Route, involving the maintenance of the Connellsville interchange.

If the requested Demmler conditions were imposed, P. & L. E. could easily cause a diminution of traffic sufficient to trigger the transfer of its interchange point from Connellsville to Demmler. This switch to Demmler would have the effect of greatly reducing costs to P. & L. E., but allowing it to reap substantially the same revenue as it enjoyed previously. But such routing of P. & L. E. traffic over the B. & O. direct line (Central States Dispatch Route) rather than over the Pittsburgh Dispatch Route would cause disastrous losses to Western Maryland because of

the reduction in traffic moving over its line (Tr. 401).

Apparently the only justification advanced by plaintiff for these proposed Demmler conditions is that they are needed as a *quid pro quo* or instrumentality of "countervailing power" to offset B. & O.'s access to P. & L. E. industries in Pittsburgh by virtue of the reciprocal switching provision contained in the Penn-Central merger conditions. That provision, however, was imposed (in lieu of the divestiture of P. & L. E. by Penn-Central advocated by the Antitrust Division) in order to prevent a Penn-Central monopoly of traffic from industries located on the P. & L. E., 327 I.C.C. at 520. (The P. & L. E. had formerly been in the New York Central system, and in competition with the Pennsylvania system). Formation of the Penn-Central without reciprocal switching at Pittsburgh would have diverted such traffic to the Pennsylvania's routes, to the detriment of both the B. & O. and Western Maryland routes. (328 I.C.C. at 703–705).

▪ But the purpose of the Commission in the case at bar in imposing conditions was to protect the Pittsburgh Dispatch Route against diversions made possible by B. & O.-C. & O. control over Western Maryland (328 I.C.C. at 705–706), not to undo, dilute, or modify the equilibrium established in the Penn-Central merger. Plaintiff's argument based upon B. & O. access to P. & L. E. industries by virtue of reciprocal switching is altogether specious and was properly rejected by the Commission. The Commission fell into no error in rejecting the conditions proposed by plaintiff. On the other hand, the conditions which the Commission did impose were just and reasonable, and in full conformity with the statutory standards.

## CONCLUSION

▪ For the foregoing reasons, it is clear that the Interstate Commerce Commission's order here under review was based upon proper application of appropriate legal standards and was supported by substantial evidence. It therefore can not be set aside by this Court, but must be sustained and continue in full force and effect.

## ORDER

AND NOW, *November 25, 1968,* in accordance with the foregoing opinion, all relief prayed for in the complaint is denied. The order of the Interstate Commerce Commission filed February 23, 1968 in Finance Docket No. 23178 which is set forth in the complaint is in all respects affirmed, and judgment is directed to be entered in favor of the defendant, and the complaint is dismissed.

It is so ordered.