Justice Breyer,
with whom Justice Ginsburg and Justice Kagan join,
dissenting.
The Vermont statute before us adversely affects expression in one, and only one, way. It deprives pharmaceutical *581 and data-mining companies of data, collected pursuant to the government's regulatory mandate, that could help pharmaceutical companies create better sales messages. In my view, this effect on expression is inextricably related to a lawful governmental effort to regulate a commercial enterprise. The First Amendment does not require courts to apply a special “heightened” standard of review when reviewing such an effort. And, in any event, the statute meets the First Amendment standard this Court has previously applied when the government seeks to regulate commercial speech. For any or all of these reasons, the Court should uphold the statute as constitutional.
I
The Vermont statute before us says pharmacies and certain other entities
“shall not [(1)] sell . . . regulated records containing preseriber-identifiable information, nor [(2)] permit the use of [such] records ... for marketing or promoting a prescription drug, unless the prescriber consents.” Vt. Stat. Ann., Tit. 18, § 4631(d) (Supp. 2010).
It also says that
“[(3)] [pharmaceutical manufacturers and pharmaceutical marketers shall not use preseriber-identifiable information for marketing or promoting a prescription drug unless the prescriber consents.” Ibid.
For the most part, I shall focus upon the first and second of these prohibitions. In Part IV, I shall explain why the third prohibition makes no difference to the result.
I — i
In Glickman v. Wileman Brothers & Elliott, Inc., 521 U. S. 457 (1997), this Court considered the First Amendment’s application to federal agricultural commodity mar *582 keting regulations that required growers of fruit to make compulsory contributions to pay for collective advertising. The Court reviewed the lawfulness of the regulation’s negative impact on the growers’ freedom voluntarily to choose their own commercial messages “under the standard appropriate for the review of economic regulation.” Id., at 469.
In this case I would ask whether Vermont’s regulatory provisions work harm to First Amendment interests that is disproportionate to their furtherance of legitimate regulatory objectives. And in doing so, I would give significant weight to legitimate commercial regulatory objectives — as this Court did in Glickman. The far stricter, specially “heightened” First Amendment standards that the majority would apply to this instance of commercial regulation are out of place here. Ante, at 657, 563, 565, 566, 568, 570, 571.
A
Because many, perhaps most, activities of human beings living together in communities take place through speech, and because speech-related risks and offsetting justifications differ depending upon context, this Court has distinguished for First Amendment purposes among different contexts in which speech takes place. See, e. g., Snyder v. Phelps, 562 U. S. 443, 451-452 (2011). Thus, the First Amendment imposes tight constraints upon government efforts to restrict, e.g., “core” political speech, while imposing looser constraints when the government seeks to restrict, e. g., commercial speech, the speech of its own employees, or the regulation-related speech of a firm subject to a traditional regulatory program. Compare Boos v. Barry, 485 U. S. 312, 321 (1988) (political speech), with Central Hudson Gas & Elec. Corp. v. Public Serv. Comm’n of N. Y., 447 U. S. 557 (1980) (commercial speech), Pickering v. Board of Ed. of Township High School Dist. 205, Will Cty., 391 U. S. 563 (1968) (government employees), and Glickman, supra (economic regulation).
*583 These test-related distinctions reflect the constitutional importance of maintaining a free marketplace of ideas, a marketplace that provides access to “social, political, esthetic, moral, and other ideas and experiences.” Red Lion Broadcasting Co. v. FCC, 395 U.S. 867, 390 (1969); see Abrams v. United States, 250 U. S. 616, 630 (1919) (Holmes, J., dissenting). Without such a marketplace, the public could not freely choose a government pledged to implement policies that reflect the people's informed will.
At the same time, our cases make clear that the First Amendment offers considerably less protection to the maintenance of a free marketplace for goods and services. See Florida Bar v. Went For It, Inc., 515 U. S. 618, 623 (1995) (“We have always been careful to distinguish commercial speech from speech at the First Amendment’s core”). And they also reflect the democratic importance of permitting an elected government to implement through effective programs policy choices for which the people’s elected representatives have voted.
Thus this Court has recognized that commercial speech including advertising has an “informational function” and is not “valueless in the marketplace of ideas.” Central Hudson, supra, at 563; Bigelow v. Virginia, 421 U. S. 809, 826 (1975). But at the same time it has applied a less than strict, “intermediate” First Amendment test when the government directly restricts commercial speech. Under that test, government laws and regulations may significantly restrict speech, as long as they also “directly advance” a “substantial” government interest that could not “be served as well by a more limited restriction.” Central Hudson, supra, at 564. Moreover, the Court has found that “sales practices” that are “misleading, deceptive, or aggressive” lack the protection of even this “intermediate” standard. 44 Liquormart, Inc. v. Rhode Island, 517 U. S. 484, 501 (1996) (opinion of Stevens, J.); see also Central Hudson, supra, at 563; Virginia Bd. of Pharmacy v. Virginia Citizens Consumer *584 Council, Inc., 425 U. S. 748, 772 (1976). And the Court has emphasized the need, in applying an “intermediate” test, to maintain the
“ ‘commonsense’ distinction between speech proposing a commercial transaction, which occurs in an area traditionally subject to government regulation, and other varieties of speech.” Ohralik v. Ohio State Bar Assn., 436 U. S. 447, 455-456 (1978) (quoting Virginia Bd. of Pharmacy, supra, at 771, n. 24; emphasis added).
The Court has also normally applied a yet more lenient approach to ordinary commercial or regulatory legislation that affects speech in less direct ways. In doing so, the Court has taken account of the need in this area of law to defer significantly to legislative judgment — as the Court has done in cases involving the Commerce Clause or the Due Process Clause. See Glickman, 521 U. S., at 475-476. “Our function” in such cases, Justice Brandéis said, “is only to determine the reasonableness of the legislature’s belief in the existence of evils and in the effectiveness of the remedy provided.” New State Ice Co. v. Liebmann, 285 U. S. 262, 286-287 (1932) (dissenting opinion); Williamson v. Lee Optical of Okla., Inc., 348 U. S. 483, 488 (1955) (“It is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it”); United States v. Carolene Products Co., 304 U. S. 144, 152 (1938) (“[RJegulatory legislation affecting ordinary commercial transactions is not to be pronounced unconstitutional” if it rests “upon some rational basis within the knowledge and experience of the legislators”).
To apply a strict First Amendment standard virtually as a matter of course when a court reviews ordinary economic regulatory programs (even if that program has a modest impact upon a firm’s ability to shape a commercial message) would work at cross-purposes with this more basic constitutional approach. Since ordinary regulatory programs can *585 affect speech, particularly commercial speech, in myriad ways, to apply a “heightened” First Amendment standard of review whenever such a program burdens speech would transfer from legislatures to judges the primary power to weigh ends and to choose means, threatening to distort or undermine legitimate legislative objectives. See Glickman, supra, at 476 (“Doubts concerning the policy judgments that underlie” a program requiring fruitgrowers to pay for advertising they disagree with does not “justify reliance on the First Amendment as a basis for reviewing economic regulations”). Cf. Johanns v. Livestock Marketing Assn., 544 U. S. 550, 560-562 (2005) (applying less scrutiny when the compelled speech is made by the Government); United States v. United Foods, Inc., 533 U. S. 405, 411 (2001) (applying greater scrutiny where compelled speech was not “ancillary to a more comprehensive program restricting marketing autonomy”). To apply a “heightened” standard of review in such cases as a matter of course would risk what then-Justice Rehnquist, dissenting in Central Hudson, described as a
“retur[n] to the bygone era of Lochner v. New York, 198 U. S. 45 (1905), in which it was common practice for this Court to strike down economic regulations adopted by a State based on the Court’s own notions of the most appropriate means for the State to implement its considered policies.” 447 U. S., at 589.
B
There are several reasons why the Court should review Vermont’s law “under the standard appropriate for the review of economic regulation,” not “under a heightened standard appropriate for the review of First Amendment issues.” Glickman, 521 U. S., at 469. For one thing, Vermont’s statute neither forbids nor requires anyone to say anything, to engage in any form of symbolic speech, or to endorse any particular point of view, whether ideological or related to the sale *586 of a product. Cf. id., at 469-470. (And I here assume that Central Hudson might otherwise apply. See Part III, infra.)
For another thing, the same First Amendment standards that apply to Vermont here would apply to similar regulatory actions taken by other States or by the Federal Government acting, for example, through Food and Drug Administration (FDA) regulation. (And the Federal Government’s ability to pre-empt state laws that interfere with existing or contemplated federal forms of regulation is here irrelevant.)
Further, the statute’s requirements form part of a traditional, comprehensive regulatory regime. Cf. United Foods, supra, at 411. The pharmaceutical drug industry has been heavily regulated at least since 1906. See Pure Food and Drugs Act, 34 Stat. 768. Longstanding statutes and regulations require pharmaceutical companies to engage in complex drug testing to ensure that their drugs are both “safe” and “effective.” 21 U. S. C. §§ 355(b)(1), (d). Only then can the drugs be marketed, at which point drug companies are subject to the FDA’s exhaustive regulation of the content of drug labels and the manner in which drugs can be advertised and sold. § 352(f)(2); 21 CFR pts. 201-203 (2010).
Finally, Vermont’s statute is directed toward information that exists only by virtue of government regulation. Under federal law, certain drugs can be dispensed only by a pharmacist operating under the orders of a medical practitioner. 21 U. S. C. § 353(b). Vermont regulates the qualifications, the fitness, and the practices of pharmacists themselves, and requires pharmacies to maintain a “patient record system” that, among other things, tracks who prescribed which drugs. Vt. Stat. Ann., Tit. 26, §§ 2041(a), 2022(14) (Supp. 2010); Vt. Bd. of Pharmacy Admin. Rules (Pharmacy Rules) 9.1, 9.24(e) (2009). But for these regulations, pharmacies would have no way to know who had told customers to buy which drugs (as is the case when a doctor tells a patient to take a daily dose of aspirin).
*587 Regulators will often find it necessary to create tailored restrictions on the use of information subject to their regulatory jurisdiction. A car dealership that obtains credit scores for customers who want car loans can be prohibited from using credit data to search for new customers. See 15 U. S. C. § 1681b (2006 ed. and Supp. III); cf. Trans Union Corp. v. FTC, 245 F. 3d 809, reh'g denied, 267 F. 3d 1138 (CADC 2001). Medical specialists who obtain medical records for their existing patients cannot purchase those records in order to identify new patients. See 45 CFR § 164.508(a)(3) (2010). Or, speaking hypothetically, a public utilities commission that directs local gas distributors to gather usage information for individual customers might permit the distributors to share the data with researchers (trying to lower energy costs) but forbid sales of the data to appliance manufacturers seeking to sell gas stoves.
Such regulatory actions are subject to judicial review, e. g., for compliance with applicable statutes. And they would normally be subject to review under the Administrative Procedure Act to make certain they are not “arbitrary, capricious, [or] an abuse of discretion.” 5 U. S. C. §706(2)(A) (2006 ed.). In an appropriate case, such review might be informed by First Amendment considerations. But regulatory actions of the kind present here have not previously been thought to raise serious additional constitutional concerns under the First Amendment. But cf. Trans Union LLC v. FTC, 536 U. S. 915 (2002) (Kennedy, J., dissenting from denial of certiorari) (questioning ban on use of consumer credit reports for target marketing). The ease with which one can point to actual or hypothetical examples with potentially adverse speech-related effects at least roughly comparable to those at issue here indicates the danger of applying a “heightened” or “intermediate” standard of First Amendment review where typical regulatory actions affect commercial speech (say, by withholding information that a *588 commercial speaker might use to shape the content of a message).
Thus, it is not surprising that, until today, this Court has never found that the First Amendment prohibits the government from restricting the use of information gathered pursuant to a regulatory mandate — whether the information rests in government files or has remained in the hands of the private firms that gathered it. But cf. ante, at 566-570. Nor has this Court ever previously applied any form of “heightened” scrutiny in any even roughly similar case. See Los Angeles Police Dept. v. United Reporting Publishing Corp., 528 U. S. 32 (1999) (no heightened scrutiny); compare Cincinnati v. Discovery Network, Inc., 507 U. S. 410, 426 (1993) (“[Commercial speech can be subject to greater governmental regulation than noncommercial speech” because of the government’s “interest in preventing commercial harms”), with ante, at 565, 566, 573, 579 (suggesting that Discovery Network supports heightened scrutiny when regulations target commercial speech).
C
The Court (suggesting a standard yet stricter than Central Hudson) says that we must give content-based restrictions that burden speech “heightened” scrutiny. It adds that “[cjommercial speech is no exception.” Ante, at 566. And the Court then emphasizes that this is a case involving both “content-based” and “speaker-based” restrictions. See ante, at 563, 564, 565, 566, 568, 570, 571, 572, 574, 575, 577, 579, 580.
But neither of these categories — “content-based” nor “speaker-based” — has ever before justified greater scrutiny when regulatory activity affects commercial speech. See, e. g., Capital Broadcasting Co. v. Mitchell, 333 P. Supp. 582 (DC 1971) (three-judge court), summarily aff’d sub nom. Capital Broadcasting Co. v. Acting Attorney General, 405 U. S. 1000 (1972) (upholding ban on radio and television marketing of tobacco). And the absence of any such precedent is understandable.
*589 Regulatory programs necessarily draw distinctions on the basis of content. Virginia Bd. of Pharmacy, 425 U. S., at 761, 762 (“If there is a kind of commercial speech that lacks all First Amendment protection,... it must be distinguished by its content”). Electricity regulators, for example, oversee company statements, pronouncements, and proposals, but only about electricity. See, e.g., Vt. Pub. Serv. Bd. Rules 3.100 (1983), 4.200 (1986), 5.200 (2004). The Federal Reserve Board regulates the content of statements, advertising, loan proposals, and interest rate disclosures, but, only when made by financial institutions. See 12 CFR pts. 226, 230 (2011). And the FDA oversees the form and content of labeling, advertising, and sales proposals of drugs, but not of furniture. See 21 CFR pts. 201-203. Given the ubiquity of content-based regulatory categories, why should the “content-based” nature of typical regulation require courts (other things being equal) to grant legislators and regulators less deference? Cf. Board of Trustees of State Univ. of N. Y. v. Fox, 492 U. S. 469, 481 (1989) (courts, in First Amendment area, should “provide the Legislative and Executive Branches needed leeway” when regulated industries are at issue).
Nor, in the context of a regulatory program, is it unusual for particular rules to be “speaker-based,” affecting only a class of entities, namely, the regulated firms. An energy regulator, for example, might require the manufacturers of home appliances to publicize ways to reduce energy consumption, while exempting producers of industrial equipment. See, e. g., 16 CFR pt. 305 (2011) (prescribing labeling requirements for certain home appliances); Nev. Admin. Code §§ 704.804, 704.808 (2010) (requiring utilities to provide consumers with information on conservation). Or a trade regulator might forbid a particular firm to make the true claim that its cosmetic product contains “cleansing grains that scrub away dirt and excess oil” unless it substantiates that claim with detailed backup testing, even though oppo *590 nents of cosmetics use need not substantiate their claims. Morris, F. T. C. Orders Data To Back Ad Claims, N. Y. Times, Nov. 3, 1973, p. 32; Boys’ Life, Oct. 1973, p. 64; see 36 Fed. Reg. 12068 (1971). Or the FDA might control in detail just what a pharmaceutical firm can, and cannot, tell potential purchasers about its products. Such a firm, for example, could not suggest to a potential purchaser (say, a doctor) that he or she might put a pharmaceutical drug to an “off label” use, even if the manufacturer, in good faith and with considerable evidence, believes the drug will help. All the while, a third party (say, a researcher) is free to tell the doctor not to use the drug for that purpose. See 21 CFR pt. 99; cf. Buckman Co. v. Plaintiffs’ Legal Comm., 531 U. S. 341, 350-351 (2001) (discussing effect of similar regulations in respect to medical devices); see also Proposed Rule, Revised Effectiveness Determination; Sunscreen Drug Products for Over-the-Counter Human Use, 76 Fed. Reg. 35672 (2011) (proposing to prohibit marketing of sunscreens with sun protection factor of greater than 50 due to insufficient data “to indicate that there is additional clinical benefit”).
If the Court means to create constitutional barriers to regulatory rules that might affect the content of a commercial message, it has embarked upon an unprecedented task — a task that threatens significant judicial interference with widely accepted regulatory activity. Cf, e. g., 21 CFR pts. 201-203. Nor would it ease the task to limit its “heightened” scrutiny to regulations that only affect certain speakers. As the examples that I have set forth illustrate, many regulations affect only messages sent by a small class of regulated speakers, for example, electricity generators or natural gas pipelines.
The Court also uses the words “aimed” and “targeted” when describing the relation of the statute to drug manufacturers. Ante, at 564, 565, 567, 572, 578. But, for the reasons just set forth, to require “heightened” scrutiny on this *591 basis is to require its application early and often when the State seeks to regulate industry. Any statutory initiative stems from a legislative agenda. See, e. g., Message to Congress, May 24,1937, H. R. Doc. No. 255, 75th Cong., 1st Sess., 4 (request from President Franklin Roosevelt for legislation to ease the plight of factory workers). Any administrative initiative stems from a regulatory agenda. See, e. g., Exec. Order No. 12866, 58 Fed. Reg. 51735 (1993) (specifying how to identify regulatory priorities and requiring agencies to prepare agendas). The related statutes, regulations, programs, and initiatives almost always reflect a point of view, for example, of the Congress and the administration that enacted them and ultimately the voters. And they often aim at, and target, particular firms that engage in practices about the merits of which the Government and the firms may disagree. Section 2 of the Sherman Act, 15 U. S. C. § 2, for example, which limits the truthful, nonmisleading speech of firms that, due to their market power, can affect the competitive landscape, is directly aimed at, and targeted at, monopolists.
In short, the case law in this area reflects the need to ensure that the First Amendment protects the “marketplace of ideas,” thereby facilitating the democratic creation of sound government policies without improperly hampering the ability of government to introduce an agenda, to implement its policies, and to favor them to the exclusion of contrary policies. To apply “heightened” scrutiny when the regulation of commercial activities (which often involve speech) is at issue is unnecessarily to undercut the latter constitutional goal. The majority’s view of this case presents that risk.
Moreover, given the sheer quantity of regulatory initiatives that touch upon commercial messages, the Court’s vision of its reviewing task threatens to return us to a happily bygone era when judges scrutinized legislation for its interference with economic liberty. History shows that the power was much abused and resulted in the constitutional- *592 ization of economic theories preferred by individual jurists. See Lochner v. New York, 198 U. S. 45, 75-76 (1905) (Holmes, J., dissenting). By inviting courts to scrutinize whether a State’s legitimate regulatory interests can be achieved in less restrictive ways whenever they touch (even indirectly) upon commercial speech, today’s majority risks repeating the mistakes of the past in a manner not anticipated by our precedents. See Central Hudson, 447 U. S., at 589 (Rehnquist, J., dissenting); cf. Railroad Comm’n of Tex. v. Rowan & Nichols Oil Co., 310 U. S. 573, 580-581 (1940) (“A controversy like this always calls for fresh reminder that courts must not substitute their notions of expediency and fairness for those which have guided the agencies to whom the formulation and execution of policy have been entrusted”).
Nothing in Vermont’s statute undermines the ability of persons opposing the State’s policies to speak their mind or to pursue a different set of policy objectives through the democratic process. Whether Vermont’s regulatory statute “targets” drug companies (as opposed to affecting them unintentionally) must be beside the First Amendment point.
This does not mean that economic regulation having some effect on speech is always lawful. Courts typically review the lawfulness of statutes for rationality and of regulations (if federal) to make certain they are not “arbitrary, capricious, [or] an abuse of discretion.” 5 U. S. C. § 706(2)(A). And our valuable free-speech tradition may play an important role in such review. But courts do not normally view these matters as requiring “heightened” First Amendment scrutiny — and particularly not the unforgiving brand of “intermediate” scrutiny employed by the majority. Because the imposition of “heightened” scrutiny in such instances would significantly change the legislative/judicial balance, in a way that would significantly weaken the legislature’s authority to regulate commerce and industry, I would not apply a “heightened” First Amendment standard of review in this case.
*593 pH HH I — I
Turning to the constitutional merits, I believe Vermont’s statute survives application of Central Hudson’s "intermediate” commercial speech standard as well as any more limited “economic regulation” test.
A
The statute threatens only modest harm to commercial speech. I agree that it withholds from pharmaceutical companies information that would help those entities create a more effective selling message. But I cannot agree with the majority that the harm also involves unjustified discrimination in that it permits “pharmacies” to “share prescriber-identifying information with anyone for any reason” (but marketing). Ante, at 572. Whatever the First Amendment relevance of such discrimination, there is no evidence that it exists in Vermont. The record contains no evidence that prescriber-identifying data is widely disseminated. See App. 248, 255. Cf. Burson v. Freeman, 504 U. S. 191, 207 (1992) (plurality opinion) (“States adopt laws to address the problems that confront them. The First Amendment does not require States to regulate for problems that do not exist”); Bates v. State Bar of Ariz., 433 U. S. 350, 380 (1977) (“[T]he justification for the application of overbreadth analysis applies weakly, if at all, in the ordinary commercial context”).
The absence of any such evidence likely reflects the presence of other legal rules that forbid widespread release of prescriber-identifying information. Vermont’s Pharmacy Rules, for example, define “unprofessional conduct” to include “[d]ivulging or revealing to unauthorized persons patient or practitioner information or the nature of professional pharmacy services rendered.” Rule 20.1(i) (emphasis added); see also Reply Brief for Petitioners 21. The statute reinforces this prohibition where pharmaceutical marketing is at issue. And the exceptions that it creates are narrow and concern common and often essential uses of prescription *594 data. See Vt. Stat. Ann., Tit. 18, § 4631(e)(1) (pharmacy reimbursement, patient care management, health care research); § 4631(e)(2) (drug dispensing); § 4631(e)(3) (communications between prescriber and pharmacy); § 4631(e)(4) (information to patients); §§4631(e)(5)-(6) (as otherwise provided by state or federal law). Cf. Trans Union Corp., 245 F. 3d, at 819 (rejecting an underinclusiveness challenge because an exception to the Fair Credit Reporting Act concerned “ 'exactly the sort of thing the Act seeks to promote’ ” (quoting Trans Union Corp. v. FTC, 81 F. 3d 228, 234 (CADC 1996))).
Nor can the majority find record support for its claim that the statute helps “favored” speech and imposes a “burde[n]” upon “disfavored speech by disfavored speakers.” Ante, at 574. The Court apparently means that the statute (1) prevents pharmaceutical companies from creating individualized messages that would help them sell their drugs more effectively, but (2) permits “counterdetailing” programs, which often promote generic drugs, to create such messages using prescriber-identifying data. I am willing to assume, for argument’s sake, that this consequence would significantly increase the statute’s negative impact upon commercial speech. But cf. 21 CFR §§ 202.1(e)(1), (e)(5)(fi) (FDA’s “fair balance” requirement); App. 193 (no similar FDA requirement for nondrug manufacturers). The record before us, however, contains no evidentiary basis for the conclusion that any such individualized counterdetailing is widespread, or exists at all, in Vermont.
The majority points out, ante, at 560, that Act 80, of which § 4631 was a part, also created an “evidence-based prescription drug education program,” in which the Vermont Department of Health, the Department of Vermont Health Access, and the University of Vermont, among others, work together “to provide information and education on the therapeutic and cost-effective utilization of prescription drugs” to health professionals responsible for prescribing and dispensing *595 prescription drugs, Vt. Stat. Ann., Tit. 18, § 4622(a)(1). See generally §§4621-4622. But that program does not make use of prescriber-identifying data. Reply Brief for Petitioners 11.
The majority cites testimony by two witnesses in support of its statement that “States themselves may supply the prescriber-identifying information used in [counterdetailing] programs.” Ante, at 560. One witness explained that academic detailers in Pennsylvania work with state health officials to identify physicians serving patients whose health care is likewise state provided. App. 375. The other, an IMS Health officer, observed that Vermont has its own multipayer database containing prescriber-identifying data, which could be used to talk to doctors about their prescription patterns and the lower costs associated with generics. Id., at 313. But nothing in the record indicates that any “counterdetailing” of this kind has ever taken place in fact in Vermont. State-sponsored health care professionals sometimes meet with small groups of doctors to discuss best practices and generic drugs generally. See University of Vermont, College of Medicine, Office of Primary Care, Vermont Academic Detailing Program (July 2010), http:// www.med.uvm.edu/ahec/downloads/VTAD_overview_2010. 07.08.pdf (all Internet materials as visited June 21, 2011, and available in Clerk of Court's case file). Nothing in Vermont's statute prohibits brand-name manufacturers from undertaking a similar effort.
The upshot is that the only commercial-speech-related harm that the record shows this statute to have brought about is the one I have previously described: the withholding of information collected through a regulatory program, thereby preventing companies from shaping a commercial message they believe maximally effective. The absence of precedent suggesting that this kind of harm is serious reinforces the conclusion that the harm here is modest at most.
*596 B
The legitimate state interests that the statute serves are “substantial.” Central Hudson, 447 U. S., at 564. Vermont enacted its statute
“to advance the state’s interest in protecting the public health of Vermonters, protecting the privacy of pre-scribers and prescribing information, and to ensure costs are contained in the private health care sector, as well as for state purchasers of prescription drugs, through the promotion of less costly drugs and ensuring prescribers receive unbiased information.” § 4631(a).
These objectives are important. And the interests they embody all are “neutral” in respect to speech. Cf. ante, at 579.
The protection of public health falls within the traditional scope of a State’s police powers. Hillsborough County v. Automated Medical Laboratories, Inc., 471 U. S. 707, 719 (1985). The fact that the Court normally exempts the regulation of “misleading” and “deceptive” information even from the rigors of its “intermediate” commercial speech scrutiny testifies to the importance of securing “unbiased information,” see 44 Liquormart, 517 U. S., at 501 (opinion of Stevens, J.); Central Hudson, supra, at 563, as does the fact that the FDA sets forth as a federal regulatory goal the need to ensure a “fair balance” of information about marketed drugs, 21 CFR §§ 202.1(e)(1), (e)(5)(ii). As major payers in the health care system, health care spending is also of crucial state interest. And this Court has affirmed the importance of maintaining “privacy” as an important public policy goal— even in respect to information already disclosed to the public for particular purposes (but not others). See Department of Justice v. Reporters Comm. for Freedom of Press, 489 U. S. 749, 762-771 (1989); see also Solove, A Taxonomy of Privacy, 154 U. Pa. L. Rev. 477, 520-522 (2006); cf. NASA v. Nelson, 562 U. S. 134, 144-146 (2011) (discussing privacy interests in nondisclosure).
*597 At the same time, the record evidence is sufficient to permit a legislature to conclude that the statute “directly advances” each of these objectives. The statute helps to focus sales discussions on an individual drug’s safety, effectiveness, and cost, perhaps compared to other drugs (including generics). These drug-related facts have everything to do with general information that drug manufacturers likely possess. They have little, if anything, to do with the name or prior prescription practices of the particular doctor to whom a detailer is speaking. Shaping a detailing message based on an individual doctor’s prior prescription habits may help sell more of a particular manufacturer’s particular drugs. But it does so by diverting attention from scientific research about a drug’s safety and effectiveness, as well as its cost. This diversion comes at the expense of public health and the State’s fiscal interests.
! Vermont compiled a substantial legislative record to corroborate this line of reasoning. See Testimony of Sean Flynn (Apr. 11, 2007), App. in No. 09-1913-cv(L) etc. (CA2), p. A-1156 (hereinafter CA2 App.) (use of data mining helps drug companies “to cover up information that is not in the best light of their drug and to highlight information that makes them look good”); Volker & Outterson, New Legislative Trends Threaten the Way Health Information Companies Operate, Pharmaceutical Pricing & Reimbursement 2007, id., at A-4235 (one former detailer considered prescriber-identifying data the “‘greatest tool in planning our approach to manipulating doctors’” (quoting Whitney, Big (Brother) Pharma: How Drug Reps Know Which Doctors To Target, New Republic, Aug. 29, 2006, http://www.tnr.cona/ article/84056/health-care-eli-lilly-pfizer-ama); Testimony of Paul Harrington (May 3, 2007), CA2 App. A-1437 (describing data-mining practices as “secret and manipulative activities by the marketers”); Testimony of Julie Brill (May 3,2007), id., at A-1445 (restrictions on data mining “ensur[e] that the FDA’s requirement of doctors receiving fair and balanced in *598 formation actually occurs”); Written Statement of Jerry Avorn & Aaron Kesselheim, id., at A-4310 (citing studies that “indicate that more physician-specific detailing will lead to more prescriptions of brand-name agents, often with no additional patient benefit but at much higher cost to patients and to state-based insurance programs, which ■will continue to drive up the cost of health care”); id., at A-4311 (“Making it more difficult for manufacturers to tailor their marketing strategies to the prescribing histories of individual physicians would actually encourage detailers to present physicians with a more neutral description of the product”); see also Record in No. l:07-cv-00188-jgm (D Vt.), Doc. 414, pp. 53-57, 64 (hereinafter Doc. 414) (summarizing record evidence).
These conclusions required the legislature to make judgments about whether and how to ameliorate these problems. And it is the job of regulatory agencies and legislatures to make just these kinds of judgments. Vermont's attempts to ensure a “fair balance” of information is no different from the FDA’s similar requirement, see 21 CFR §§ 202.1(e)(1), (e)(5)(h). No one has yet suggested that substantial portions of federal drug regulation are unconstitutional. Why then should we treat Vermont’s law differently?
The record also adequately supports the State’s privacy objective. Regulatory rules in Vermont make clear that the confidentiality of an individual doctor’s prescribing practices remains the norm. See, e. g., Pharmacy Rule 8.7(c) (“Prescription and other patient health care information shall be secure from access by the public, and the information shall be kept confidential”); Pharmacy Rule 20.1(i) (forbidding disclosure of patient or prescriber information to “unauthorized persons” without consent). Exceptions to this norm are comparatively few. See, e. g., ibid, (identifying “authorized persons”); Vt. Stat. Ann., Tit. 18, § 4631(e); App. 248, 255 (indicating that prescriber-identifying data is not widely disseminated). There is no indication that the State of Ver *599 mont, or others in the State, makes use of this information for counterdetailing efforts. See supra, at 594-595.
Pharmaceutical manufacturers and the data miners who sell information to those manufacturers would like to create (and did create) an additional exception, which means additional circulation of otherwise largely confidential information. Vermont’s statute closes that door. At the same time, the statute permits doctors who wish to permit use of their prescribing practices to do so. §§ 4631(c)-(d). For purposes of Central Hudson, this would seem sufficiently to show that the statute serves a meaningful interest in increasing the protection given to prescriber privacy. See Fox, 492 U. S., at 480 (in commercial speech area, First Amendment requires “a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served” (internal quotation marks omitted)); see also United States v. Edge Broadcasting Co., 509 U. S. 418, 434 (1993) (The First Amendment does not “require that the Government make progress on every front before it can make progress on any front”); Burson, 504 U. S., at 207 (plurality opinion).
C
The majority cannot point to any adequately supported, similarly effective “more limited restriction.” Central Hudson, 447 U. S., at 564. It says that doctors “can, and often do, simply decline to meet with detailers.” Ante, at 575. This fact, while true, is beside the point. Closing the office door entirely has no similar tendency to lower costs (by focusing greater attention upon the comparative advantages and disadvantages of generic drug alternatives). And it would not protect the confidentiality of information already released to, say, data miners. In any event, physicians are unlikely to turn detailers away at the door, for those detail-ers, whether delivering a balanced or imbalanced message, are nonetheless providers of much useful information. See *600 Manchanda & Honka, The Effects and Role of Direct-to-Physician Marketing in the Pharmaceutical Industry: An Integrative Review, 5 Yale J. Health Pol’y L. & Ethics 785, 793-797, 815-816 (2005); Ziegler, Lew, & Singer, The Accuracy of Drug Information From Pharmaceutical Sales Representatives, 273 JAMA 1296 (1995). Forcing doctors to choose between targeted detailing and no detailing at all could therefore jeopardize the State’s interest in promoting public health.
The majority also suggests that if the “statute provided that prescriber-identifying information could not be sold or disclosed except in narrow circumstances then the State might have a stronger position.” Ante, at 580; see also ante, at 572-573. But the disclosure-permitting exceptions here are quite narrow, and they serve useful, indeed essential purposes. See supra, at 593-594. Compare Vt. Stat. Ann., Tit. 18, § 4631(e), with note following 42 U. S. C. §1320d-2, p. 1190, and 45 CFR § 164.512 (uses and disclosures not requiring consent under the Health Insurance Portability and Accountability Act of 1996). Regardless, this alternative is not “a more limited restriction,” Central Hudson, supra, at 564 (emphasis added), for it would impose a greater, not a lesser, burden upon the dissemination of information.
Respondents' alternatives are no more helpful. Respondents suggest that “Vermont can simply inform physicians that pharmaceutical companies . . . use prescription history information to communicate with doctors.” Brief for Respondent Pharmaceutical Research and Manufacturers of America 48. But how would that help serve the State’s basic purposes? It would not create the “fair balance” of information in pharmaceutical marketing that the State, like the FDA, seeks. Cf. Reno v. American Civil Liberties Union, 521 U. S. 844, 874 (1997) (alternative must be “at least as effective in achieving the legitimate purpose that the statute was enacted to serve”). Respondents also suggest policies requiring use of generic drugs or educating doctors *601 about their benefits. Brief for Respondent Pharmaceutical Research and Manufacturers of America 54-55. Such programs have been in effect for some time in Vermont or other States, without indication that they have prevented the imbalanced sales tactics- at which Vermont’s statute takes aim. See, e. g., Written Statement of Jerry Avorn & Aaron Kesselheim, CA2 App. A-4310; Doc. 414, at 60-61. And in any event, such laws do not help protect prescriber privacy.
Vermont has thus developed a record that sufficiently shows that its statute meaningfully furthers substantial state interests. Neither the majority nor respondents suggests any equally effective “more limited” restriction. And the First Amendment harm that Vermont’s statute works is, at most, modest. I consequently conclude that, even if we apply an “intermediate" test such as that in Central H'udson, this statute is constitutional.
<1
What about the statute’s third restriction, providing that “[pharmaceutical manufacturers and pharmaceutical marketers” may not “use prescriber-identifiable information for marketing or promoting a prescription drug unless the pre-scriber consents”? Yt. Stat. Ann., Tit. 18, § 4631(d) (emphasis added). In principle, I should not reach this question. That is because respondent pharmaceutical manufacturers, marketers, and data miners seek a declaratory judgment and injunction prohibiting the enforcement of this statute. See 28 U. S. C. § 2201; App. 49-128. And they have neither shown nor claimed that they could obtain significant amounts of “prescriber-identifiable information” if the first two prohibitions are valid. If, as I believe, the first two statutory prohibitions (related to selling and disclosing the information) are valid, then the dispute about the validity of the third provision is not “ Teal and substantial’ ” or “ 'definite and concrete.’” MedImmune, Inc. v. Genentech, Inc., 549 *602 U. S. 118, 127 (2007) (quoting Aetna Life Ins. Co. v. Haworth, 300 U. S. 227, 240-241 (1937)) (Article III does not permit courts to entertain such disputes).
The Court, however, strikes down all three provisions, and so I add that I disagree with the majority as to the constitutionality of the third restriction as well — basically for the reasons I have already set out. The prohibition against pharmaceutical firms using this prescriber-identifying information works no more than modest First Amendment harm; the prohibition is justified by the need to ensure unbiased sales presentations, prevent unnecessarily high drug costs, and protect the privacy of prescribing physicians. There is no obvious equally effective, more limited alternative.
V
In sum, I believe that the statute before us satisfies the “intermediate” standards this Court has applied to restrictions on commercial speech. A fortiori it satisfies less demanding standards that are more appropriately applied in this kind of commercial regulatory case — a case where the government seeks typical regulatory ends (lower drug prices, more balanced sales messages) through the use of ordinary regulatory means (limiting the commercial use of data gathered pursuant to a regulatory mandate). The speech-related consequences here are indirect, incidental, and entirely commercial. See supra, at 585-588.
The Court reaches its conclusion through the use of important First Amendment categories — “content-based,” “speaker-based,” and “neutral” — but without taking full account of the regulatory context, the nature of the speech effects, the values these First Amendment categories seek to promote, and prior precedent. See supra, at 581-585, 589-592, 597. At best the Court opens a Pandora’s Box of First Amendment challenges to many ordinary regulatory practices that may only incidentally affect a commercial message. See, e. g., supra, at 587-588, 589-590. At worst, it *603 reawakens Lochner’s pre-New Deal threat of substituting judicial for democratic decisionmaking where ordinary economic regulation is at issue. See Central Hudson, 447 U. S., at 589 (Rehnquist, J., dissenting).
Regardless, whether we apply an ordinary commercial speech standard or a less demanding standard, I believe Vermont’s law is consistent with the First Amendment. And with respect, I dissent.